## STATE v. OSBORNE WILLIAMS.

(Filed 12 December, 1923.)

**1. Criminal Law—Assault Upon a Female—Statutes—Evidence.**

Evidence that a negro man twenty-three years of age several times accosted a white girl fifteen years of age, on the streets of a town, with improper solicitation, resulting in her fleeing from him in a direction she had not intended to go, and, in her great fear of him, causing her to become nervous and to lose sleep at night, *is held* to be such evidence of violence, begun to be executed with ability to effectuate it, as will come within the intent and meaning of C. S., sec. 4215, making it a crime for a man or boy over eighteen years of age to assault any female person. .

**2. Same—Instructions—Constitutional Law—Equal Rights—Races.**

Where there is evidence, upon the trial of an assault by a negro man twenty-three years of age upon a white girl fifteen years of age sufficient for conviction under the provisions of our statute (C. S., sec. 4215), the recitation thereof by the judge in his instructions to the jury is not objectionable as coming under the inhibition of Article XIV, sec. 1, of the Federal Constitution, that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, or deprive them of life, liberty, or property without due process of law, or of the equal protection of the laws.

APPEAL by defendant from *McElroy, J.,* at March Term, 1923, of HENDERSON.

Criminal action. This was an indictment against the defendant, as follows:

"The jurors for the State, upon their oath, do present: That Osborne Williams, in Henderson County, on 29 November, 1922, did unlawfully and wilfully assault, beat and wound one Dora Justus, a female person, said Osborne Williams being a man, or boy, over eighteen years of age, to the great damage of the said Dora Justus, contrary to the statute in such cases made and provided, and against the peace and dignity of the State."

Dora Thompson testified: "My name is Dora Thompson; was Dora Justus before I married. On the morning of the 29th of last November I was starting to school, was on Main Street, and Osborne Williams was coming from the school. He brushed past me and said, 'Give me some of your——,' and I went home and told my mother that evening, and my sister, and I was so nervous. When he said that to me, I walked on. It happened at another time when I was coming out of Foster's grocery store and he was coming in. He repeated the same thing, and I went and told my mother again. It frightened me. It happened another time. The third time it was in front of the Royal Café. I had started there. I did not do anything, only went on; I went on into the Ten-

Cent Store, where I had started. He repeated the same thing—used the same words—in front of Livingston's store, and I ran back. I was afraid of him."

On redirect examination she testified: "When he brushed by me and made this proposition, he did not touch me. I did not go to school, as I had before. In the morning I would go with my girl friends. When I would go back to dinner my brother-in-law would take me back, as I was afraid, and he would take me to school every day at dinner."

Emma Justus testified: "I am the mother of Dora Thompson, who has just been on the stand. I remember when she came home and reported to me what took place in regard to this defendant, Osborne Williams. She said that he asked her to give him some of her——. She made that report to me five times. She was nervous and everything. She was so badly scared she could not rest at night. She got with her girl friends going to school when she could, and I made arrangements about her going. She got with my son-in-law, Mr. Hollingsworth. He would go with her."

It was in evidence that Dora Justus (now Thompson) is a white girl, fifteen years of age, and the defendant a negro man about twenty-three years of age.

The court charged the jury, in part, as follows:

"He (defendant) further contends, gentlemen of the jury, that, as a matter of law, taking what the prosecuting witness said as true, that it does not amount in law to an assault, as there was no apparent demonstration or effort to do her violence. Now, gentlemen of the jury, the law presumes that the defendant is innocent, and the burden is upon the State to satisfy you, beyond a reasonable doubt, of his guilt—that is, the burden is upon the State to satisfy you to a moral certainty. The question will arise in your minds, gentlemen, as to what it takes to constitute an assault. To constitute an assault, there must be a hostile demonstration of violence which, if allowed its apparent course, would do hurt or injury to another. I will read that over to you again, gentlemen: 'That to constitute an assault there must be a hostile demonstration of violence which, if allowed its apparent course, would do hurt or injury to another." It is not necessary, to constitute an assault, that the person whose conduct is in question should have the present capacity to inflict injury, but if by threats and a display of force he causes another to reasonably apprehend danger, and thereby forces him to do otherwise than he would have done, or to abandon any lawful pursuit, constitutes an assault. (Therefore, if the jury should find, beyond a reasonable doubt, that the defendant spoke the words, 'Give me some of your——,' or words similar to those, to the prosecuting witness; and if

you shall further find, beyond a reasonable doubt, that the defendant is a negro man, about twenty-three years of age, and that the prosecuting witness is a white girl, about fifteen years of age; and if you shall further find, beyond a reasonable doubt, that the language used by the defendant to the prosecuting witness, under all the facts and circumstances, amounted to such a display of force as would, and did, cause the prosecuting witness reasonably to apprehend that she was about to receive injury or hurt, and that, as a result of such apprehension or fear, caused her to run, or to do otherwise than she would have done, then, gentlemen of the jury, the court charges you that the defendant is guilty, and it is your duty to so find.)" The defendant excepted to that part of the charge commencing at "Therefore" and ending with "find." This was defendant's fourth exception.

At the close of all the evidence the defendant made a motion to nonsuit, which was refused, and defendant excepted.

The jury returned a verdict of guilty. Judgment was rendered, to which defendant excepted.

The defendant filed six assignments of error, and appealed to this Court. The assignments of error will be grouped and considered under the motion to nonsuit and the fourth assignment of error, which will present all the defendant's exceptions that are material for a decision of the case.

*Attorney-General Manning and Assistant Attorney-General Nash and Michael Schenck for the State.*
*Shipman & Justice and Frank Carter for defendant.*

CLARKSON, J. We think, from all the evidence, taken in a light most favorable for the State, that the court below did not err in submitting the case to the jury.

"In all cases of assault, with or without intent to kill or injure, the person convicted shall be punished by fine or imprisonment, or both, at the discretion of the court: *Provided,* that where no deadly weapon has been used and no serious damage done, the punishment in assaults, assaults and batteries, and affrays shall not exceed a fine of fifty dollars or imprisonment for thirty days; but this proviso shall not apply to cases of assault with intent to kill or with intent to commit rape, or to cases of assault or assault and battery by any man or boy over eighteen years old on any female person." C. S., 4215.

In *S. v. Hampton,* 63 N. C., 13, the following were the facts: "As the prosecutor was going in a crowd down one of the staircases leading out of the courthouse in Greensboro, and was stepping down the first step, the defendant, who was in front of him, and in striking distance,

stopped, turned about and, with right hand clenched, his right arm bent at his side, but not drawn back, said, 'I have a great mind to hit you'; that before this, and as the crowd was leaving the courthouse, the defendant had said, 'If the crowd will go along to see, I will cowhide Lindsay'; that Lindsay had no way to go down that staircase but by pushing past the defendant, and that he turned away from defendant and went down another staircase." *Reade, J.,* held this to be assault, and said: "An assault is an offer to strike another. . . . In the case before us the defendant placed himself immediately in front of the prosecutor, assumed an attitude to strike, within striking distance, in an angry manner, and turned the latter out of his course. This was an offer of violence and constituted an assault, unless there was something accompanying the act which qualified it and indicated that there was no purpose of violence. The only accompaniment of the act was the declaration, 'I have a great mind to strike you.' If the declaration had been, 'I intend to strike you,' that would not have qualified the act favorably for the defendant. Nor if he had said, 'I have a mind to strike you.' It is suggested, however, that the expression, 'I have a great mind to strike,' is used to express indecision." *S. v. Myerfield,* 61 N. C., 108; *S. v. Church,* 63 N. C., 15.

In *S. v. Rawles,* 65 N. C., 336, *Settle, J.,* says: "The prosecutor swears that he was put in fear and made to hasten home by the language and conduct of the defendants. His Honor instructed the jury that 'if parties use such insulting and threatening language to another as is calculated to intimidate him, and is thereby put in fear and caused to deviate from the course he was pursuing, they are guilty of an assault; and if they were satisfied that the defendants assembled themselves together with a common design, they were all equally guilty.' "

In *S. v. Jeffreys,* 117 N. C., 746, *Avery, J.,* says: "But the fact that the defendant followed her to the fence, after using the threatening language and assuming the posture which the prosecutrix described, and there took such a position that he could intercept her if she returned to her home with the water, as she had contemplated doing and induced her, through fear of his touching her, to go in the opposite direction, tended to show that he was guilty of a simple assault. This evidence, if believed, brought the case within the principle to which we have adverted, as stated in *S. v. Hampton,* 63 N. C., 13."

Punishment for simple assault is now made greater when on a female by a man over eighteen years old.

In *Humphries v. Edwards,* 164 N. C., 158, *Walker, J.,* says: "We extract the following principle from *S. v. Daniel,* 136 N. C., 571: 'The principle is well established that not only is a person who offers or

attempts by violence to injure the person of another guilty of an assault, but no one, by the show of violence, has the right to put another in fear and thereby force him to leave a place where he has the right to be. *S. v. Hampton,* 63 N. C., 13; *S. v. Church,* 63 N. C., 15; *S. v. Rawles,* 65 N. C., 334; *S. v. Shipman,* 81 N. C., 513; *S. v. Martin,* 85 N. C., 508; 39 Am. Rep., 711; *S. v. Jeffreys,* 117 N. C., 743.' It is not always necessary, to constitute an assault, that the person whose conduct is in question should have the present capacity to inflict injury, for if by threats or a menace of violence which he attempts to execute, or by threats and a display of force, he causes another to reasonably apprehend imminent danger, and thereby forces him to do otherwise than he would have done, or to abandon any lawful purpose or pursuit, he commits an assault. It is the apparently imminent danger that is threatened, rather than the present ability to inflict injury, which distinguishes violence menaced from an assault. *S. v. Jeffreys* and *S. v. Martin, supra.* It is sufficient if the aggressor, by his conduct, lead another to suppose that he will do that which he apparently attempts to do. 1 Archb. Cr. Pr., Pl. and Ev. (8th Ed., by Pomeroy), 907, 908." *Trogdon v. Terry,* 172 N. C., 542.

In the *Daniel case, supra, Walker, J.,* only decides, "The cursing of a person and ordering him to come to defendant, and he obeying, through fear, is not an assault."

There is difficulty sometimes to draw the line between "violence begun to be executed" and "violence menaced." "In general, there must be something more than mere menace or threat; and unless there is ability, at least, apparent to carry it out, there is no assault whatever. If there is apparent ability, so as to cause fear on the part of the person assailed, then, under the doctrine of the preceding section, an assault is committed." McClain's Criminal Law, secs. 233-234.

We have to be governed, to a great extent, by the facts as they appear in each particular case, to determine whether, to constitute the assault, there was "violence begun to be executed." In the instant case the prosecutrix, Dora Justus (now Thompson), was a young school-girl, about fifteen years of age, living in the town of Hendersonville. The public streets and sidewalks belong to all alike. This school-girl had a right to go anywhere on those streets, and no one, white or black, had any right to intentionally block her way and turn her from the course she was going, by actual force or by such language and show of violence that would put her in fear and make her afraid to go, or make her turn back and go some other way on account of such language accompanied with the show of violence. Four times before, the defendant had used unspeakable language to her on the streets, and the conduct of this negro, who was twenty-three years of age, was such as to terrify her to

such an extent that she was nervous and so badly frightened that she could not rest at night. The young girl was so affected by the conduct of the defendant that she had to have ·protection in going to school. The last time, as it appears from the evidence of the prosecutrix, she was on the streets, in this nervous, frightened condition (a place she had a right to be), and as she was passing "he repeated the same thing, used the same words in front of Livingston's store, and I ran back; I was afraid of him." By his conduct, previous acts and language, the final act terrified the prosecutrix to such an extent that she fled and changed her course in going along the public streets (a place she had a right to go). We think, from all the facts and circumstances in this case, the defendant, by his obscene language and request, repeated as many as five times, this conduct at different times that so terrified the young girl, and his conduct and ability to carry out the obscene request, the terror impressed on the prosecutrix, the condition of the parties—a young white girl and a negro man—the last repetition and apparent ability to carry it into effect, made the young girl flee and leave a place she had a right to be, would in law constitute an assault.

The learned attorneys for the defendant, in their fourth assignment of error, in their well-prepared brief, say: "We think this instruction is erroneous, for two reasons: (1) The instruction places emphasis upon the fact that the prosecutrix is a white girl and the defendant a negro man, but the difference in the color of the parties, as we understand the law, can make no difference. The fact that the prosecutrix was a white girl and the defendant a negro man does not affect the legal principles involved. The law would have been the same if the prosecutrix had been a negro girl and the defendant a white man, or if both had been white or both black; and, we think, the charge of the court must be considered as conveying to the minds of the jury that the difference in the color of the parties was a matter material for their consideration, and the less evidence would be required to convict the defendant because he is a negro than would have been required if he had been a white man. (2) There are no 'facts and circumstances' other than the language used by the defendant and the immaterial fact that the prosecutrix was white and the defendant black; and the instruction is the equivalent of a direction by the court to convict the defendant if the jury found that the defendant used the language, and that the use of the same 'amounted to such display of force as would, and did, cause the prosecuting witness reasonably to apprehend that she was about to receive injury or hurt, and that as a result of such apprehension or fear, caused her to run, or to do otherwise than she would have done.' We, therefore, think that the instruction is erroneous, under the authorities above cited."

We think that the court below was justified, in the charge to the jury, in charging them in regard to the difference in race, "that the defendant is a negro man about twenty-three years of age, and the prosecuting witness a white girl about fifteen years of age," etc.

Constitution of U. S., sec. 1, Art. XIV, in part, is as follows: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

This charge did not, nor was it intended to, "deny to any person within its jurisdiction the equal protection of the laws." To constitute an assault—to make a person leave a place he had a right to be, or change his course, or compel him to turn back or change his route, which he had a right to go—it must be done with such a show of violence and conduct as will indicate "violence begun to be executed," and put a person in fear, or cause a person to have a reasonable apprehension that harm or injury would be done if he did not change his course and desist from going the way he had a right to go. With this view of the law applicable to the facts in this case, the court left it to the jury to find if fear and apprehension would not be greater in a white girl fifteen years of age meeting a negro man twenty-three years of age, using such foul, indecent proposals and language to her, and make a reasonable apprehension in her that "violence was begun to be executed," that she feared she was going to be injured or hurt, he having the apparent ability to carry it into effect. No one is going to meet a lion as he would a lamb, nor a tiger as he would a cat. One creates fear, the other does not. A negro man, using this foul, indecent language towards a young white girl, as a matter of common knowledge, would create apprehension and fear, and the fact that he used such language would plainly indicate "a heart regardless of social duty and fatally bent on mischief."

We believe, in this State, that the negro has "the equal protection of the laws." In fact, the best friends that the negro has are his white neighbors. The negro has been in many respects a chosen people— brought here, the land of opportunity, among civilized people, without any effort 'on their part, from Africa. The burden "imposed, not sought," has been on the white people of this State to civilize and Christianize them. The trust has been and is being faithfully performed. The race is making great strides. It is a matter of common knowledge that if in a trial of a case before a jury that involves a moneyed transaction between a white man and a negro man, if there is the least evidence that the white man has overreached or cheated a negro, the

juries invariably decide for the negro. The best element of the negroes in this State are in full accord with law enforcement and the punishment of the negro who would overstep the bounds of race and be guilty of rape or kindred crimes. North Carolina is now spending approximately $4,000,000 a year on negro education, including nearly $2,000,000 in salaries for teachers and $1,000,000 for new and better schoolhouses. This does not include money used for the support of negro colleges and normal schools. The last Legislature of 1923 appropriated for permanent improvement and equipment $445,000 for the negro agricultural and mechanical college. The cities and towns are doing their part. The Legislature of North Carolina, at its last session, 1923, appropriated $50,000 to start a colored reformatory and training school, and approximately $10,000 for maintenance. Four hundred acres of land has been bought and directors (three white and two colored) have been appointed to manage the institution. There are institutions for the negro insane, and other institutions for the afflicted in the State.

The policy of the legislative branch of the government is to have separation of the races—in the railroads, street cars, schools, public institutions, etc., of the State—with equal accommodations. The same policy has been pursued in the cities. When a white library is built, a colored library is built. The same applies to parks and such like. In all of the cases the expenditure of money to give equal accommodations, etc., has far exceeded the taxes paid by the negro in proportion to that paid by the white people.

Our State Constitution, Art. XI, sec. 7, says: "Beneficent provision for the poor, the unfortunate and orphan, being one of the first duties of a civilized and Christian State," etc. This State through the legislative branch of the government is trying to meet this obligation to the white and negro population alike, in that station of life that each has been called.

The exception by defendant to the court's charge in this case may seem to imply a lack of duty by the white race to the negro race. We give the legislative conduct in this matter to show that those to whom a sacred duty is imposed are performing this duty through other branches of the government. It is important in the administration of law that all the citizens of the State feel that the courts will do equal and exact justice.

For the reasons stated, there is

No error.