## STATE v. HOWARD McIVER.

(Filed 14 December, 1949.)

**1. Assault § 8e—**

In order to constitute the offense of assault on a female it is not necessary that defendant have the present intent and ability to carry out the threat or menace, but it is sufficient if under the circumstances the character of the threat is such as to cause prosecutrix to go where she would not otherwise have gone or leave a place where she had a right to be.

**2. Assault § 13—**

Evidence tending to show that defendant deliberately planned to meet prosecutrix while she was on her way to work along the street of a city on successive mornings about seven o'clock and before full daylight, that he went out of his way to directly approach her on her side of the path, and repeatedly made an indecent sexual proposal to her, frightening her and, on the occasion in question, causing her to run into the street to avoid him, *is held* sufficient to be submitted to the jury in this prosecution for assault on a female.

DEFENDANT's appeal from *Nimocks, J.,* March Term, 1949, CUMBER-LAND Superior Court.

The defendant was tried in the Recorder's Court of the City of Fayetteville on a warrant charging him with an assault on a female, and found guilty. He appealed to the Superior Court of Cumberland County, where he was again found guilty by the jury, and, from the sentence imposed, appeals to this Court. The appeal poses the single question whether the evidence is legally sufficient to sustain the verdict, raised by demurrer and motion to nonsuit in the lower court.

Mrs. Helen Outlaw, the alleged subject of the assault, a white woman of good character, worked at a laundry on Russell Street in Fayetteville. She identified McIver, a colored man, as the person she met on that street, near the railroad crossing, on January 7, about 7:00 o'clock in the morning on her way to work. At that time he said to her, "You are looking pretty this morning." On Thursday morning, on her way to work, she met him again. It had been raining, and she was walking a little to the edge of the sidewalk. "There was no street there, and I looked around, back of this water, and he was coming toward me, right around the water and he started talking."

It is not necessary to print the remark, but it may fairly be construed as an indecent sexual proposal. "I was so frightened I got off the street and a car must have been right there because it honked at me and I went on across the street."

She reported these occurrences to the police, and had an assurance that she would receive protection, was told to go on next day as she had usually been doing.

On Friday morning, about the same hour, when she had gotten to about the same place on her way to work—she again met the defendant, and he said to her precisely the same thing as before. Mr. McLaurin, of the police force, who had promised to be there, appeared. Mrs. Outlaw pointed out the man to the policeman, and crumpled into a sitting position on the sidewalk.

She testified that the indecent proposals of the defendant had such an effect on her as to "upset her all over." "I could not work; the supervisor had to send a girl back to help me out. I was certainly frightened that morning. I couldn't even stand up. I just folded up on the ground."

The defendant was placed under arrest.

On cross-examination she testified: "This colored man never placed a hand on me in his life; I don't know whether he would have or not, but he was coming." The occurrence, she stated, was near the Bryan Pontiac place, and the Coca-Cola plant.

She further stated that when he accosted her on Thursday morning he was "coming around the water towards me. There was a pool of water

there. I was on one side and he was on the other; . . . he was coming right around towards me. I got off into the street and he went on . . . I did not look. I did run, I ran into the street. It isn't right to say that I stepped out to go on the other side of the puddle and he went on the other . . . I got on the street and crossed and didn't see him any more. He didn't try to follow that I know of. He didn't try to bother me that I know of . . . As to whether he bothered me that morning, he didn't put his hands on me, but he certainly upset me . . . As to whether he tried to follow me or go after me . . . I think he was there in the block waiting for me . . . It was kind of dark at 6 :45 in January on a rainy, dank, foggy morning; it was not very light . . . I saw him in the second block . . . at least half a block. I don't think he made any attempt to do me harm."

For the State, C. D. McLaurin, a policeman of the City of Fayetteville, testified that he saw both Mrs. Outlaw and the defendant that morning on Russell Street. He did not speak to her at that time. After witness first saw her she went on down the street. McLaurin was in a car, and watched Mrs. Outlaw go to work that morning. He circled the block up to Winslow Street. He met the defendant in front of the Coca-Cola plant, coming in his direction. Witness circled the block, turned back up that street, and about five minutes later found the defendant "going west, back in the direction of Winslow Street." Witness came back until he saw Mrs. Outlaw coming down the street, about the middle of the block, and saw this colored man meeting her, and when he was within three or four feet he said something to Mrs. Outlaw which witness was not near enough to understand. Mrs. Outlaw pointed to the defendant and McLaurin arrested him, placing him in the car. Witness then went to Mrs. Outlaw, who was sitting on the edge of the curb, and she identified the man as the man who had molested her.

On cross-examination the witness testified that it was light enough for him to recognize the defendant. "There is no sidewalk there; it is a path where people generally walk . . . used as a sidewalk." The man did not stop walking when meeting Mrs. Outlaw, "he made no movement to touch her; he didn't slow down . . . he was calmly walking along his way . . . I don't think he saw me until I was in two or three feet. Until then he had made no change in his speed . . . it was just before sunrise—about dawn."

Defendant demurred and moved for judgment of nonsuit. The motion was declined and defendant excepted.

Defendant introduced several witnesses who testified as to his good character.

Amongst them was Guy M. Brock, for whom defendant had been working in January when this occurrence is alleged to have taken place,

but was not working at the time of the trial. He testified that a person walking on the third block of Russell Street would not be going to his place of business.

Fay Johnson, for whom the defendant had worked about a month, said that since he had worked there his character and reputation were good.

The defendant testified in his own behalf in substance summarized as follows:

He had never seen the lady until the day he was arrested; that he was not the person who met her near the old stock pens. Explaining his presence on Russell Street the morning of his arrest, he said that he had gone to the bus station, on that street, to get some money to pay on his house. The boy was not there, and he returned down Russell Street to the stockyard loading pen and then thought that while it would make him late to work, it would be better than "not to have no place to live," and went back up Russell Street to get his money, and met the woman and was arrested; that he had not said anything to her; that he was singing, moving his lips, and had been doing so all up the block; did not tell Mr. McLaurin he said "Good morning" to her.

In rebuttal witness McLaurin testified that the defendant told him at the police station 15 or 20 minutes after his arrest that he said "good morning, ma'am" to Mrs. Outlaw. Previously he had denied saying anything to her.

Witness said he had known Mrs. Outlaw for five or six years and that her character was excellent.

At the close of all the evidence counsel for defendant again demurred and renewed his motion for judgment of nonsuit, which was denied. Defendant excepted.

The evidence was submitted to the jury, and defendant was found guilty. Motion to set aside the verdict for errors committed during the trial was declined. Defendant excepted. Defendant objected and excepted to the ensuing sentence, and appealed.

*Attorney-General McMullan and Assistant Attorney-General Bruton, Walter F. Brinkley, Member of Staff, for the State.*

*Nance & Barrington for defendant, appellant.*

SEAWELL, J. The defense, contending that the conduct of the defendant as presented in the evidence for the State, could not be construed as an assault according to accepted legal definitions, presents for consideration a definition of assault, arising through threat or menace, which makes it essential that the threat be unqualified and that there must be a present intent and ability to carry it out. It is pointed out that the occurrence for which the defendant was convicted took place on a much

traveled street in the City of Fayetteville, and that there was, therefore, no opportunity to carry out any unlawful design which the defendant may have entertained.

That picture does not fit any too closely the frame of the evidence at the time of the occurrence, to which the attention of the Court is more closely directed. It took place before sunrise in January, about 6:50 o'clock on a gray, misty morning at a time there is little evidence of urban activity. However that may be, perhaps it might be said that the surroundings were not favorable for the commission, at that spot, of a more heinous crime; but nevertheless, as described by the State's witness, the manner of defendant in approaching her on that Thursday morning was sufficient to put her in fear that some personal violence, or at least unwelcome physical contact, might result from the sexual urge which, from the proposition he made, seemed to animate the defendant.

And we observe that North Carolina is rightly listed as one of the jurisdictions in which it is not essential to the definition of assault, or to the completion of that crime, that there should be a present ability to carry out the threat or menace if it is sufficient in manner and character to cause the person menaced to forego some right of conduct he intended to exercise, or to leave a place where he had a right to be. *S. v. Williams,* 186 N.C. 627, 120 S.E. 224, 6 C.J.S., "Assault and Battery," sec. 64, n. 50; *S. v. Daniel,* 136 N.C. 571, 48 S.E. 544.

The facts in the *Williams case, supra,* strikingly parallel those of the instant case. In that case there was never any physical contact between the defendant and the young woman, the victim of the assault, and the defendant did not follow or pursue her at any time; the incidents upon which the conviction rested occurred in places just as public or more public than obtains in the instant case; as here, there was repetition of the obscene proposal; the language used was not more threatening than that used by this defendant; and the Court unanimously sustained the conviction.

We do not attempt to re-array the authorities cited in *S. v. Williams, supra,* or those collected in *S. v. Daniel, supra.* But we are constrained to follow the principles laid down in these cases, especially the *Williams case,* which should be controlling here.

The abstract principles of law with which we deal become more concrete when we consider the apparent motivation for the defendant's conduct. The menace was not that of a blow to be inflicted upon the person, or any similar injury. Its significance goes further back. Dealing with the State's evidence and speaking of the reasonable inferences which the jury might draw from it, we have the defendant making repeated obscene proposals to the same woman, implying a sexual desire which, by some obsession, had become directed especially toward her. There is an infer-

ence of deliberate planning to meet her at the same place on successive mornings, with the obsession still upon him, vocally expressed and apparent in his manner. The witness stated that the defendant went out of his way to directly approach her on her side of the path, and in fear of this menacing movement, coupled with the language which he used, she ran into the street and crossed it to avoid him.

The evidence, factually similar to that in the *Williams case,* cannot but be regarded as stronger in its implications, and it is in law sufficient to support conviction.

We find no error.

No error.