STATE v. MACK INGRAM.

(Filed 25 February, 1953.)

**1. Assault § 8a—**

In order to constitute a criminal assault there must be an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another, which show of force or menace of violence must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm.

**2. Assault § 13—Mere look from distance, without overt act or threat of violence, is insufficient to constitute assault.**

Evidence tending to show that defendant, a man over eighteen years of age, drove his automobile slowly along a public highway and "leered" at

prosecutrix as she was walking along a dirt road some distance away, that as she was passing through a small wooded area, she heard his motor stop and, although defendant was not then in sight, she ran some 215 feet until she cleared the woods, and then resumed walking, that she then saw defendant walking fast across some cultivated ground 65 or 70 feet away, that defendant stopped and that she continued walking to her destination, *is held* insufficient to be submitted to the jury in a prosecution under G.S. 14-33, since there is no evidence of any overt act, threat of violence, or offer or attempt to do immediate bodily injury to prosecutrix.

### 3. Criminal Law § 52a (2)—

In order to sustain conviction of a criminal offense there must be legal evidence of the commission of the offense charged, and evidence which raises a mere suspicion or conjecture is insufficient.

### 4. Jury § 8—

Each board of county commissioners should carefully observe the statutory procedure for the selection of the jury rolls or lists from residents of the county who are of good moral character and of sufficient intelligence to serve on juries. G.S. 9-1.

APPEAL by defendant from *Armstrong, J.,* November Term, 1953, of CASWELL. Reversed.

The defendant was charged with assault upon a female, he being a man over 18 years of age. G.S. 14-33.

In support of the charge contained in the bill the State offered the testimony of the person alleged to have been assaulted, Mrs. Edward Webster, whose name before her marriage and at the time of the alleged offense was Willie Jean Boswell. She was then 17 years of age, living on a farm with her father and mother, two brothers and two sisters. She testified substantially as follows:

On the morning of 4 June, 1951, her father, two brothers and her grandfather were working in the tobacco field. About 8:45 she left home to go to the field to help them, carrying a hoe, and wearing dungarees, a plaid shirt somewhat like a blouse, and a terrapin-shaped hat. She walked down the driveway from her home, which fronted west, 235 feet to a sand-clay road, then along that road 100 feet to the paved State Highway #62; thence along the highway 126 feet to a plantation road. As she was turning into the plantation road she saw the defendant driving a 1936 Chevrolet automobile entering the highway from the sand-clay road. He was alone in the automobile and drove along the highway in her direction at about five miles per hour. She said: "He came on up the road real slow and kept watching me, and when he got about straight across from where I was he had his head out of the window leering at me a curious look." The defendant continued to drive on along the road until he went out of her sight about 100 feet down the highway. His having his head out of the window frightened her "because he never had done

that way before when he went by there." The plantation road the witness was on led to the field where her father and brothers were at work. About 70 or 75 feet from the highway this road led through a small body of woods, and a short distance beyond passed around a barn and on to the tobacco field. As she was passing through the woods she heard the motor of defendant's car go dead, and she started running and ran a distance of 215 feet along the plantation road. She did not see the defendant when she began to run. When she came out into the open she had stopped running and was walking fast, and then she saw the defendant walking rather fast across some soft cultivated ground 65 or 70 feet from her. He stopped at some plum bushes, watching her. After she saw the defendant she continued to walk. The defendant did not speak to her. She went on to the field where her brothers and grandfather were and started crying because she was frightened. She told them what had happened; said she did not know who the man was. She had intended going one way around the barn but took the other which was nearer the tobacco field. From where defendant stopped near the plum bushes he could not have seen the men in the field. The distance from where the automobile was stopped on the highway to the plum bushes was measured and found to be 236 feet. The tracks made by the defendant in the soft ground were counted and found to be 95 in number. Those coming from the highway were wider spaced than those returning. From the plum bushes to the field where the men were working was 200 or 250 yards.

On cross-examination the State's witness said she first saw the defendant when he stopped his automobile at the stop sign before entering the highway from the sand-clay road, and that at that time she was turning off the highway into the plantation road 126 feet away; that the defendant was 150 feet from her when she noticed him doing what she called "leering" at her. When asked if she had used the word "leer" in the Recorder's Court she said she didn't think so, but that just before the first trial in November, 1951, she looked up the word in the dictionary and as well as she remembered "it was a curious look." She testified the defendant traveled 150 to 160 feet along the highway from the sand-clay road intersection "before he reached a point on the highway that was parallel with the point she was on in the plantation road; that up until that time the defendant was constantly behind her; . . . that she did not testify that defendant had his head completely out of the car when he was looking at her." As she left home she noticed her father's trailer sitting in the yard.

Other evidence offered by the State showed that when the defendant was arrested later that morning he was at the home of a man named Simpson in the tobacco field with him and his daughter, and that defendant's automobile with a trailer attached loaded with hay was in the yard.

The defendant told the officers that after he had passed the Boswell place he remembered he had seen a trailer there, and as he needed a trailer to haul some hay he went back to see if he could borrow it, but not seeing anyone at home or not finding Mr. Boswell, he returned to his automobile, and later procured a trailer from a man named Lambeth and went to Mr. Simpson's where he loaded the trailer with hay. If he had returned home with the hay he would have had to pass the Boswell home.

A. B. Boswell, father of Willie Jean, testified he had seen the defendant a few times before this, and defendant had come to his house at one time two or three years previous; and that it was customary for defendant to travel over this road in going from defendant's home to Reidsville. It was in evidence that the defendant was a tenant farmer 44 years of age, married and the father of 9 children.

The defendant's motion for judgment of nonsuit was denied. Defendant offered no evidence. There was verdict of guilty as charged, and from judgment imposing sentence the defendant appealed.

*Attorney-General McMullan, Assistant Attorney-General Love, and Robert L. Emanuel, Member of Staff, for the State.*

*E. F. Upchurch, Jr., Martin A. Martin, and C. O. Pearson for defendant, appellant.*

DEVIN, C. J. After careful consideration of all the evidence offered by the State, as set out in the record, we reach the conclusion that it was insufficient to support the charge of assault upon the State's witness, and that the motion for judgment of nonsuit aptly interposed should have been allowed.

While the elements necessary to constitute the common law offense of assault have been many times stated in the decisions of this Court and in the courts in other jurisdictions as well as by textwriters, it is sometimes difficult to determine whether the particular facts under consideration are sufficient in law to establish the criminal offense of assault.

In *S. v. Davis,* 23 N.C. 125, an assault was defined as "An intentional attempt by violence to do an injury to the person of another." In amplification of the definition in that case *Justice Gaston* made this observation: "It is difficult in practice to draw the precise line which separates violence menaced from violence begun to be executed, for until the execution of it is begun there can be no assault. We think, however, that where an unequivocal purpose of violence is accompanied by any *act* which, if not stopped, or diverted, will be followed by personal injury, the execution of the purpose is then begun—the battery is *attempted.*"

From *S. v. Daniel,* 136 N.C. 571, 48 S.E. 544, we quote: "An assault is an intentional offer or attempt by violence to do any injury to the

person of another. There must be an offer or attempt. . . . There must be an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do a corporal injury—such an act as will carry to the mind of the other person a well grounded apprehension of personal injury." It is an offer or attempt by force or violence to do injury to the person of another. *S. v. Hefner,* 199 N.C. 778, 155 S.E. 879.

In the more recent case of *S. v. McIver,* 231 N.C. 313, 56 S.E. 2d 604, it was held that it was not essential to the definition of assault that there be a present ability to inflict injury but that the menace or threat must be sufficient in manner and character to cause the person menaced to forego some right he intended to exercise or to leave the place where he had a right to be.

So that it seems well settled that in order to constitute the criminal offense of assault there must be an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another. *S. v. Davis,* 23 N.C. 125; *S. v. Hampton,* 63 N.C. 13; *S. v. Horne,* 92 N.C. 805; *S. v. Jeffreys,* 117 N.C. 743, 23 S.E. 175; *S. v. Daniel,* 136 N.C. 571, 48 S.E. 544; *Humphries v. Edwards,* 164 N.C. 154, 80 S.E. 165; *S. v. Williams,* 186 N.C. 627, 120 S.E. 224; *S. v. Gay,* 224 N.C. 141, 29 S.E. 2d 458; *S. v. Silver,* 227 N.C. 352, 42 S.E. 2d 208; *S. v. Sutton,* 228 N.C. 534, 46 S.E. 2d 310; *S. v. McIver,* 231 N.C. 313, 56 S.E. 2d 604; *People v. Doud,* 223 Mich. 120, 32 A.L.R. 1535; *Dahlin v. Fraser,* 206 Minn. 476; 4 A.J. 133; 6 C.J.S. 913.

It was said in *People v. Doud,* 223 Mich. 120, 32 A.L.R. 1535, "An assault, under practically all definitions, must carry on the face of its attendant circumstances an offer or attempt with force or violence to do a corporal hurt to another."

The display of force or menace of violence must be such as to cause the reasonable apprehension of immediate bodily harm. *Dahlin v. Fraser,* 206 Minn. 476.

The task before us here is to apply the pertinent principles of law to the facts of this case in order to determine whether the evidence offered comes within the definition of assault as laid down in the decided cases. A review of the facts underlying the decisions in several of the cited cases, where the facts there reported were in some respects similar to those in the case at bar, will serve to illustrate the line of distinction. In *S. v. Williams,* 186 N.C. 627, 120 S.E. 224, the evidence was held sufficient to go to the jury where it appeared the defendant, a man 23 years of age, met on the street the State's witness, a girl 15 years of age, and made an indecent proposal in vulgar language, as he had done on four previous occasions, which put her in fear and caused her to turn and run back. In

*S. v. Sutton,* 228 N.C. 534, 46 S.E. 2d 310, it was held the State's evidence made out a case of assault where the defendant's rude manner caused the witness to leave her office where she was employed in the courthouse at Plymouth and go out into the hall and stand on the first step leading to the courtroom above. The defendant followed and continued to stare at her. She stepped up two more steps and defendant stepped toward her still staring, and she became frightened, screamed and ran up the steps as the defendant ran up the steps behind her.

In *S. v. McIver,* 231 N.C. 313, 56 S.E. 2d 604, the prosecuting witness was on the sidewalk in an early morning dusk on way to her work when the defendant walked toward her from the opposite direction and made an indecent sexual proposal which so frightened her that she ran across the street to avoid him. He had met her at this same place with similar language and proposal on several previous occasions. It was held that this evidence was properly submitted to the jury on the charge of assault.

In *S. v. Gay,* 224 N.C. 141, 29 S.E. 2d 458, there was an overt act of unmistakable import which caused the prosecuting witness to scream and run. But in *S. v. Silver,* 227 N.C. 352, 42 S.E. 2d 208, the defendant, a Negro man, asked the State's witness, a white girl 16 years of age, an improper question while she was getting water at the pump. She became frightened and ran into the house, but there was no show of violence, no threats or display of force. The evidence was held insufficient to sustain a charge of assault. The distinction is obvious.

The facts in evidence in the case at bar are insufficient to make out a case of assault. It cannot be said that a pedestrian may be assaulted by a look, however frightening, from a person riding in an automobile some distance away.

The witness said he leered at her as he drove along the highway. This word "leer," according to the dictionary means a look askance, conveying the suggestion of something sly, malign or lustful (Webster), but the witness who used the word as descriptive of the defendant's appearance said only it meant "a curious look," without further definition, explanation or demonstration.

That she was frightened is unquestionable, but that fact alone is insufficient to constitute an assault in the absence of a menace of violence of such character, under the circumstances, as was calculated to put a person of ordinary firmness in fear of immediate injury and cause such person to refrain from doing an act he would otherwise have done, or to do something he would not have done except for the offer or threat of violence.

It is apparent that no assault was committed on her by the defendant as he drove along the highway.

True, the witness thereafter in passing through the small wooded area became frightened by the cessation of the sound of the motor and ran. But the defendant at that time was some distance away and nowhere in sight, and when she came into the open space she reduced her pace to a walk. And then when she saw the defendant walking fast across the cultivated ground and stopping at the cluster of plum bushes, 65 or 70 feet away, she did not accelerate her speed, and continued to walk to the destination she had in view. She said the defendant watched her, but he uttered no sound, made no gesture, did not again leer at her, and then turned and walked back the way he came. There was here no overt act, no threat of violence, no offer or attempt to injure.

It may have been that the defendant had a sinister purpose in stopping his automobile and walking or running the 95 steps across the field. Certainly his stated reason for doing so was rather lame. He may have looked with lustful eyes when he watched her walking along the road, but there was absence of any overt act constituting an offer or attempt to do injury to the person of the witness.

We cannot convict him of a criminal offense solely for what may have been in his mind. Human law does not reach that far.

Hence we may not predicate an assault upon the fact of his approach across the field as related by the witness. To extend by judicial fiat the outreach of the criminal law to embrace the incidents here unfolded would be to enlarge the definition of assault beyond that heretofore declared by this Court or such as would be thought necessary for the protection of the equal personal rights of all. To convict a person of a criminal offense there must be legal evidence of the commission of the offense charged, something more than is sufficient to raise a suspicion or conjecture. S. v. Prince, 182 N.C. 788, 108 S.E. 330.

In view of our conclusion that the motion for judgment of nonsuit should have been allowed, we do not reach the question raised by the defendant's appeal, whether there was any evidence to support the finding by the trial judge that there had been no intentional or systematic exclusion of Negroes from jury service in Caswell County. Akins v. Texas, 325 U.S. 398.

But we deem it proper to call attention to the testimony tending to show that the Board of County Commissioners of Caswell County had not observed the statute in making up the jury lists of the County. The Chairman of the Board testified that in selecting jurors to serve in the Superior Court the custom prevailed of getting from the election registration books the names of prospective jurors and putting them in the box, and that from the lists thus obtained the requisite number of names were drawn to serve as jurors at each term of court. The statute G.S. 9-1 provides that the Board of County Commissioners shall biennially cause

their Clerk to lay before them the tax returns of the preceding year from which they shall select the names of all such persons as have paid their taxes and are of good moral character and of sufficient intelligence to serve on juries.   This statute was amended by Chap. 1007 Public Laws of 1947 to add the further provision that the commissioners shall cause their Clerk to lay before them also a list of names of persons resident and twenty-one years of age who do not appear on the tax returns from which the commissioners shall select the names of those of good moral character and sufficient intelligence.   It is further provided in the Act that the Clerk, in making out the lists of names to be laid before the Commissioners, may secure said lists from such reliable sources of information as will provide the names of those qualified for jury duty.

In *S. v. Brown,* 233 N.C. 202, 63 S.E. 2d 99, *Chief Justice Stacy* interpreted this statute as follows: "Prior to 1947, it was provided by G.S. 9-1 that the tax returns of the preceding year for the county should constitute the source from which the jury list should be drawn, and this was then the only prescribed source.   To meet the constitutional change of the previous election making women eligible to serve on juries, the statute was amended in 1947 enlarging the source to include not only the tax returns of the preceding year but also 'a list of names of persons who do not appear upon the tax lists, who are residents of the county and over twenty-one years of age,' to be prepared in each county by the Clerk of the Board of Commissioners."

Said *Justice Walker* in *S. v. Mallard,* 184 N.C. 667 (674), 114 S.E. 17: "It is not for the commissioners, or others selected to perform public duties, to substitute for the methods chosen by the Legislature those of their own as being more desirable and better adapted to accomplish the end in view."   And as expressed by *Justice Brogden* in *Hinton v. Hinton,* 196 N.C. 341, 145 S.E. 615: "It is clear, therefore, that the law not only guarantees the right of trial by jury, but also the right of trial by a proper jury; that is to say, a jury possessing the qualifications contemplated by law."

In giving effect to the constitutional guarantee of trial by jury it was the manifest purpose of the Legislature that all those and only those citizens who possess the proper qualifications of character and intelligence should be selected to serve on the juries.   A careful observance by County Commissioners of the provisions of the statute regulating the compilation of jury lists and prescribing the sources of information to aid in determining the qualifications of those listed would do much to improve the quality of juries.   The due administration of justice depends in large measure upon the character and intelligence of the persons selected for jury service.   No more important task devolves upon the boards of County Commissioners than the selection of those eligible to serve in this

capacity, those who may be called upon to decide issues of the weightiest character.

For the reasons hereinbefore set out we hold that judgment of nonsuit should have been entered at the close of the evidence, and that the ruling of the court below in denying this motion and proceeding to judgment must be

Reversed.