PHILLIP E. SWEATT, JR., Administrator of the Estate of Rachel Sweatt, Deceased, Plaintiff v. SHE LING WONG, M.D., and EUGENE S. STANTON, M.D., Defendants

No. COA00-608

(Filed 17 July 2001)

## 1. Witnesses— expert—medical malpractice—general surgeon

An emergency room physician who was board certified in laparoscopic procedures was qualified to testify as an expert witness under N.C.G.S. § 8C-1, Rule 702 against defendant general surgeons as to the applicable standard of care for a laparoscopic cholecystectomy, because: (1) the witness engaged in the same diagnostic procedures as did defendants, including an active clinical practice which included diagnosing patients with post-abdominal surgery complications such as infections; and (2) the witness was engaged in instructing residents in the emergency department regarding his patients. Furthermore, the admission of this testimony was not prejudicial error because another expert witness offered testimony from which the jury could find defendants failed to adhere to the applicable standard of care in their diagnosis and treatment of the patient.

**2. Jury— alternate manner and procedure of selection—employees of sheriff's department**

The trial court did not err in a medical malpractice action by the manner and procedure of selecting and summoning jurors even though jury selection is handled in Richmond County by employees of the sheriff's department, because: (1) N.C.G.S. § 9-2.1 allows for alternate procedures to be utilized for selecting jurors in certain counties, and Richmond County has utilized this alternate procedure for a number of years; (2) defendant failed to make a timely objection to the manner in which jurors were selected; and (3) defendant failed to show prejudice in the manner in which jurors were selected for the jury pool.

**3. Agency— apparent—doctors—medical malpractice—motion for judgment notwithstanding the verdict**

The trial court did not err in a medical malpractice action by denying defendant's motion for judgment notwithstanding the verdict under N.C.G.S. § 1A-1, Rule 50(b) on plaintiff's claim of apparent agency between defendant doctors, because: (1) the evidence showed the defendant who performed surgery on the patient told the patient and her family that he was going on vacation but was leaving the patient in the care of the other defendant doctor whom he believed would take good care of her; (2) this defendant also informed the patient and her family that the other defendant doctor had assisted him in the patient's surgery; and (3) the patient and her family justifiably relied on this defendant's representation of agency.

Appeal by defendant Wong from judgment entered 28 September 1999 by Judge Steve A. Balog in Richmond County Superior Court. Heard in the Court of Appeals 28 March 2001.

*Maxwell, Freeman & Bowman, P.A., by James B. Maxwell, for plaintiff-appellee.*

*Wilson & Iseman, L.L.P., by G. Gray Wilson, for defendant-appellant Wong.*

WALKER, Judge.

This appeal arises out of a medical malpractice action in which the jury awarded the estate (plaintiff) of deceased Rachel Sweatt (Sweatt) $850,000 in damages as a result of the joint and several neg-

ligence of general surgeons She Ling Wong (defendant) and Eugene Stanton (Stanton). Sweatt was admitted to the Emergency Room of Richmond Memorial Hospital on 12 December 1993 experiencing extreme abdominal pain. The next day a sonogram revealed multiple gallstones and possible acute cholecystitis. Dr. Gilbert Arenas (Dr. Arenas), her family physician, recommended that she see defendant for a laparoscopic cholecystectomy (lap choley) to remove Sweatt's gallbladder. Defendant advised Sweatt that she would be out of the hospital within a "couple of days" after the surgery, which was performed on 14 December 1993. Stanton assisted in the surgery at defendant's request.

Defendant reported to the Sweatt family that the surgery had gone well. However, during the time Sweatt would have been discharged under normal circumstances, she experienced symptoms of complications which included distention of her abdomen, constant need of pain medication and listlessness. At this time, defendant ordered tests, including a series of x-rays of Sweatt's abdomen. A radiologist interpreted the x-rays "as revealing a large amount of free air in the abdomen." Defendant read the x-ray report on 16 December 1993.

On 17 December 1993, before defendant went on vacation, he left Sweatt in the care of Stanton. According to Stanton, defendant reported to him that Sweatt probably had some obstruction in the small intestine or other problems, but that she was progressing relatively well. Defendant did not report to Stanton the findings of the x-ray report. Stanton testified that upon first examining Sweatt on 17 December 1993, he suspected she had an abdominal abscess; however, he took no action to treat that infection.

Dr. Arenas, who had continued to visit Sweatt daily, became increasingly concerned about her deteriorating condition. On 21 December 1993, after learning she had an abnormally high white blood count, Dr. Arenas ordered a CT scan and consulted with Dr. Charles Collins (Dr. Collins), a general surgeon. On the same day, Stanton recorded in Sweatt's chart that she could be discharged "because she was doing so well."

As soon as Dr. Collins reviewed Sweatt's records, he determined she was in need of an emergency, life-saving laparotomy which he performed later that day. The surgery revealed Sweatt had a perforation in the lower portion of her stomach caused by the lap choley procedure. Sweatt was then transferred to the University of North

Carolina Hospital at Chapel Hill under the care of Dr. Robert Rutledge (Dr. Rutledge). She remained there almost continuously until 31 March 1994, during which time she underwent several major surgeries. After being discharged, Sweatt was unable to return to work due to her weakened physical condition. She retired from her employment and later died on 12 April 1998.

[1] We first address defendant's assignment of error that the trial court erred in allowing Dr. David Wellman to testify in that he was not properly qualified under Rule 702 of the North Carolina Rules of Evidence. N.C.R. Evid. 702 (1999).

At trial, plaintiff called two expert witnesses who testified as to the negligence of defendants. The first of the experts, Dr. Samuel Esterkyn (Dr. Esterkyn), is a board certified general surgeon practicing and teaching in San Francisco, California. He was one of the first surgeons in this country to perform lap choleys and had performed approximately 950 to 1000 such procedures, continuing on a weekly basis at the time of trial. The second expert, Dr. David Wellman (Dr. Wellman), is a general surgeon who was board certified in laparoscopic procedures. In 1990, he became director in the emergency department at Duke University Medical Center, where he examined and diagnosed patients who, after surgery, presented signs and symptoms similar to those of Sweatt. In addition, Dr. Wellman instructed residents in the emergency department regarding patients he treated.

At the outset, we note this Court has recently addressed the qualifying of an expert witness within Rule 702, where we held "[o]rdinarily whether a witness qualifies as an expert is exclusively within the discretion of the trial judge." *Formyduval v. Bunn*, 138 N.C. App. 381, 385, 530 S.E.2d 96, 99, *disc. review denied*, 353 N.C. 262, 546 S.E.2d 93 (2000) (citation omitted). Rule 702 of our Rules of Evidence, which sets forth the qualifications of an expert witness, provides in pertinent part:

> (b) In a medical malpractice action . . ., a person shall not give expert testimony on the appropriate standard of health care . . . unless the person is a licensed health care provider . . . and meets the following criteria:
>
> > (1) If the party against whom or on whose behalf the testimony is offered is a specialist, the expert witness must:
> >
> > > a. Specialize in the same specialty as the party against whom or on whose behalf the testimony is offered; or

      b. Specialize in a similar specialty which includes within its specialty the performance of the procedure that is the subject of the complaint and have prior experience treating similar patients.

   (2) During the year immediately preceding the date of the occurrence . . . have devoted a majority of his or her professional time to either or both of the following:

      a. The active clinical practice [in that specialty] . . . ; or

      b. The instruction of students [in that specialty]. . . .

N.C.R. Evid. 702 (b)(1),(2). In addition, we held "a doctor who is either board certified in a specialty or who holds himself out to be a specialist or limits his practice to a specific field of medicine is properly deemed a 'specialist' for purposes of Rule 702." *Formyduval* at 388, 530 S.E.2d at 101. This is because our legislature intended the term "specialist" to include a broader category of physicians than those who are board certified. *Id.* at 389, 530 S.E.2d at 102.

    Defendants cite *Allen v. Carolina Permanente Med. Grp., P.A.*, 139 N.C. App. 342, 533 S.E.2d 812 (2000), in which this Court held that a general surgeon did not qualify as an expert witness in a medical malpractice case against a physician who was board certified in family practice medicine. In *Allen*, we stated the general surgeon "did not and could not qualify as an expert witness against [defendant] . . . because family practice is not within the specialty of general surgery." *Id.* at 348, 533 S.E.2d at 815. In that case, when asked about how the patient should have been treated, the general surgeon answered ". . . I have an opinion as to how [the patient] possibly could have been treated, but as far as the way [the patient] should have been, again it falls in the expertise out of my field. . . ." *Id.* at 350, 533 S.E.2d at 816-17. Thus, the general surgeon admitted he did not specialize in the same or similar specialty as that of the defendant family practitioner.

    Defendant argues the rule in *Formyduval* supports his position that Dr. Wellman, as an emergency room physician, was not qualified to testify against defendant and Stanton who are general surgeons. *Formyduval* at 381, 530 S.E.2d at 96. In *Formyduval*, the malpractice action centered around the defendant physicians' negligence in diagnosis and treatment. *Id.* at 382-83, 530 S.E.2d at 98. There, defendant was a general practitioner engaged in clinical practice and diagnostic work without a specialty. *Id.* at 382, 530 S.E.2d at 98. The expert wit-

ness which plaintiff sought to proffer specialized in emergency medicine but he was disqualified because he did not engage in diagnostic work as defendant nor did he engage in substantial clinical practice. *Id.* at 383, 530 S.E.2d at 98. This Court also noted the expert witness spent more time in administrative duties than in treating patients. *Id.* at 391, 530 S.E.2d at 103. This Court further stated "[a]s plaintiff tendered no other expert witness to testify on the standard of care applicable to defendant, the trial court also properly granted defendant's motion for directed verdict." *Id.*

We find *Formyduval* to be distinguished from the instant case. First, there is evidence Dr. Wellman engaged in the same diagnostic procedures as did defendants. He had an active clinical practice which included diagnosing patients with post-abdominal surgery complications such as infections. In addition to his active clinical diagnostic practice, Dr. Wellman was also engaged in instructing residents in the emergency department regarding his patients. Therefore, Dr. Wellman was properly qualified as an expert witness under Rule 702(b)(1)(b) and (2).

Additionally, Dr. Esterkyn offered testimony from which the jury could find defendant and Stanton failed to adhere to the applicable standard of care in their diagnosis and treatment of Sweatt. Thus, even in the absence of Dr. Wellman's testimony, there was sufficient evidence on which the jury could base its verdict. The trial court did not err in allowing Dr. Wellman to testify as to the applicable standard of care.

[2] In his second assignment of error, defendant contends the manner and procedure of selecting and summoning jurors was improper and prevented him from receiving a fair trial. Defendant contends the system utilized in Richmond County violates the statutory requirements because it contains no procedural safeguards to ensure fairness, since jury selection is handled by employees of the sheriff's department.

The selection of jurors in this State is controlled by N.C. Gen. Stat. § 9-1 (1999), which provides "there shall be appointed in each county a jury commission of three members." It is the duty of each jury commission to prepare a list of prospective jurors qualified to serve, using the voter registration records of each county, as well as a list of licensed drivers residing in each county. N.C. Gen. Stat. § 9-2(b) and (c) (1999). The jury commission is then permitted to merge the two lists, remove duplicate names from each source and

then randomly select the names to form the list from which potential jurors are selected. N.C. Gen. Stat. § 9-2(e).

N.C. Gen. Stat. § 9-2.1 (1999) further allows for an alternate procedure to be utilized for selecting jurors in certain counties and is set forth as follows:

> (a) In counties having access to electronic data processing equipment, the functions of preparing and maintaining custody of the list of prospective jurors, the procedure for drawing and summoning panels of jurors, and the procedure for maintaining records of names of jurors who have served, been excused, been delayed in service, or been disqualified, *may be performed by this equipment*, except that decisions as to mental or physical competency of prospective jurors shall continue to be made by jury commissioners.

N.C. Gen. Stat. § 9-2.1 (emphasis added). This alternate procedure had been utilized in Richmond County for a number of years.

There, a computer program run by a privately owned company merges a voter registration list with the list of licensed drivers in the county and then turns this list over to the jury commission. The jury commission then eliminates duplicates and disqualifications before using the list as its juror selection database. The only individuals who may access this database and have knowledge of its password consist of the information technology support manager for the county, as well as two civil employees of the sheriff's department. When the clerk of court needs a jury pool, the sheriff's department is notified and one of its two civil employees accesses the database to enter the number of jurors needed. This results in a list of randomly selected names arranged in numerical order. These named persons are then summoned for jury duty by the sheriff's department.

In this State, a " 'mere irregularity on the part of the jury commissioners in preparing the jury list, unless obviously, designedly, or intentionally discriminatory, would not vitiate the list or afford a basis for a challenge to the array.' " *State v. Massey*, 316 N.C. 558, 570, 342 S.E.2d 811, 818-19 (1986), *quoting State v. Ingram*, 237 N.C. 197, 204, 74 S.E.2d 532, 537 (1952). Further, the mere failure to follow a statutory requirement, without a showing or allegation of how such failure affected [the complainant], is not a sufficient basis to quash the jury list. *State v. Riggs*, 79 N.C. App. 398, 339 S.E.2d 676 (1986).

In denying defendant's motion for a new trial, the trial court found in pertinent part the following:

a. All of the information raised by [defendant] in his [motion and affidavits] [were] available to [him] well before the commencement of this matter on September 7th, 1999.

b. At no time prior to September 7th, 1999 or on the date when this trial commenced, nor at any time during the course of the trial up to and through the conclusion of the jury's verdict, did [defendant] raise any issues or questions concerning the manner and procedure of selecting and summoning the jury.

c. During the course of the *voir dire* examination of the jury, [defendant] did not utilize all of his peremptory challenges and, in fact, according to the record, had two such challenges remaining when he, through his counsel, passed on the jury panel as seated and found them acceptable.

d. The provisions of N.C.G.S. § 9.2-1 for selecting and summoning a jury *venire* for the trial of this action were followed, and there was no prejudice to any one, including [defendant], in the manner by which the jury *venire* was drawn and summoned for this trial.

e. There was no prejudice to anyone, including [defendant], by virtue of the fact that a civil employee of the Sheriff's Office entered the password that commanded the data processing equipment to randomly produce a list of jurors for the September 7, 1999 Session of Superior Court in Richmond County.

f. [Defendant] was not prejudiced in the manner and procedure of selecting and summoning the jury *venire* for the trial of this action commencing September 7th, 1999.

On appeal, defendant cites *Lupton v. Spencer*, 173 N.C. 126, 91 S.E. 718 (1917) and *Boyer v. Teague*, 106 N.C. 576, 11 S.E. 665 (1890), where in each case a new trial was ordered because the sheriff had been involved in selecting and summoning certain jurors under an allegation that he was an interested party or that he was intermeddling or perpetrating a fraud. However, this case differs from *Lupton* and *Boyer*, in that defendant failed to make a timely objection to the manner in which jurors were selected, as did the defendants in those cases.

Furthermore, based on the findings by the trial court and our review of the record, we conclude the trial court properly determined defendant had failed to show prejudice in the manner in which jurors were selected for the jury pool in this trial. This assignment of error is therefore overruled.

**[3]** In his third assignment of error, defendant contends the trial court erred in denying his motion for judgment notwithstanding the verdict (JNOV) under Rule 50(b) of our Rules of Civil Procedure in part because there was no evidence of an agency relationship. N.C.R. Civ. P. 50(b) (1999). In support of this contention, defendant specifically contends there was no evidence: (1) he represented to Sweatt that Stanton was his agent; or (2) that Sweatt relied upon any representation of an agency relationship between defendant and Stanton.

A motion for JNOV "is essentially a renewal of an earlier motion for directed verdict[,]" and "is cautiously and sparingly granted." *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 368-69, 329 S.E.2d 333, 337-38, *affirmed in part and reversed in part*, 313 N.C. 362, 329 S.E.2d 333 (1985) (citations omitted). The standard is whether the evidence is sufficient "to take the case to the jury." *Abels v. Renfro Corp.*, 335 N.C. 209, 214, 436 S.E.2d 822, 825 (1993) (citations omitted). Further, ". . . the evidence must be considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference." *Martishius v. Carolco Studios, Inc.*, 142 N.C. App. 216, 228, 542 S.E.2d 303, 311 (2001) (citation omitted).

This Court has held that a party can be held liable for another party's negligence based on the doctrine of apparent agency. This doctrine holds "a principal who represents to a third party that another is his agent is liable for harm caused the third party by the apparent agent if the third party justifiably relied on the principal's representation." *Hoffman v. Moore Regional Hospital*, 114 N.C. App. 248, 252, 441 S.E.2d 567, 570, *disc. review denied*, 336 N.C. 605, 447 S.E.2d 391 (1994) (citation omitted).

Defendant cites the recent case of *Noell v. Kosanin*, 119 N.C. App. 191, 457 S.E.2d 742 (1995), where plaintiff alleged defendant surgeon was liable for defendant anesthesiologist's negligence under the doctrine of apparent agency. This Court held the evidence was sufficient for the jury to consider the issue of apparent agency where

plaintiff's evidence showed defendant anesthesiologist had provided plaintiff with a pamphlet before surgery stating that he worked jointly with defendant plastic surgeon. *Id.* at 197, 457 S.E.2d at 746.

Defendant also cites *Hoffman* where this Court held even when agency is established, there nevertheless must be evidence plaintiff relied on such representation in order to recover under the doctrine of apparent agency. *Hoffman* at 252, 441 S.E.2d at 570. In that case, the plaintiff patient sought to recover damages for alleged medical negligence from a hospital under the theory of *respondeat superior* for the negligence of the treating physician who was found to be an independent contractor. *Id.* at 249, 447 S.E.2d at 568. Plaintiff's evidence failed to show reliance in that she "would have sought treatment elsewhere or done anything differently had she known for a fact that [defendant surgeon] was not an employee of the hospital." *Id.* at 252, 447 S.E.2d at 570.

Here, the evidence showed defendant told Sweatt and her family he was going on vacation but was leaving Sweatt in the care of Stanton, whom he believed would take good care of her. Also, defendant informed Sweatt and her family that Stanton had assisted him in her surgery. Prior to that time, neither Sweatt nor any member or her family had spoken to Stanton nor had they been offered a choice as to which physician would continue Sweatt's care in defendant's absence. Sweatt and her family thus justifiably relied on defendant's representation of agency. These facts, in the light most favorable to plaintiff, create an issue of whether an agency relationship exists between defendant and Stanton. Thus, the trial court did not err in denying defendant's motion for JNOV.

We have carefully considered defendant's remaining assignments of error and consider them to be without merit.

No error.

Judges HUNTER and TYSON concur.