TEDDY RAY BRYANT AND OMA P. BRYANT v. NATIONWIDE MUTUAL FIRE INSURANCE COMPANY

No. 274PA84

(Filed 7 May 1985)

1. Insurance § 136— fire insurance—instructions on affirmative defense of misrepresentation

The trial court correctly charged the jury on an insurance company's affirmative defense of misrepresentation.

Bryant v. Nationwide Mut. Fire Ins. Co.

2. **Insurance § 136— fire insurance—affirmative defense of misrepresentation—judgment n.o.v. improper**

The trial court erred by granting defendant insurance company's motion for judgment n.o.v. on the issue of misrepresentation during the investigation of plaintiffs' claim where the evidence was sufficient to support a jury finding that plaintiffs did not swear falsely or willfully make material misrepresentations of their marital status and financial condition during the investigation of their claim. The male plaintiff's original misstatement concerning his marital status was corrected in a later sworn statement, and there was a question of whether his marital status was material. The male plaintiff's limited education, the extensive questioning, and his difficulty in understanding questions presented a question for the jury as to whether he had related his financial circumstances to the best of his ability, considering the average person's ability to remember figures and amounts with precision. G.S. 58-176(c).

3. **Rules of Civil Procedure § 59— new trial—Rule 59(a)(7) and (8) distinguished—no abuse of discretion**

In an action to collect under a fire insurance policy, the Court of Appeals erred by reversing the trial judge's grant of a new trial. Defendant's motion was made pursuant to G.S. 1A-1, Rule 59(a)(7), rather than Rule 59(a)(8), because defendant did not object to or specify any error of law, the trial judge in his order made no intimation that he was granting a new trial for an error in law, and there was no specific error identified in the record or in the judge's order. Appellate review under Rule 59(a)(7), allowing new trials for insufficiency of evidence to justify the verdict, is limited to whether the trial judge abused his discretion; a review of the record in this case indicates no manifest abuse of discretion. G.S. 58-176(c).

Justice VAUGHN did not participate in the consideration or decision of this case.

ON discretionary review pursuant to G.S. 7A-31 of a unanimous decision of the Court of Appeals, 67 N.C. App. 616, 313 S.E. 2d 803 (1984), reversing an order by *Hairston, J.*, entered at the 13 September 1982 civil session of SURRY County Superior Court, granting defendant's motions for judgment notwithstanding the verdict and to set aside the jury verdict and award a new trial.

*Gardner, Gardner, Johnson and Donnelly, by Gus L. Donnelly for plaintiff-appellee.*

*Petree, Stockton, Robinson, Vaughn, Glaze and Maready, by W. Thompson Comerford, Jr., and G. Gray Wilson for defendant-appellant.*

FRYE, Justice.

This appeal presents two separate and distinct issues that are procedural in nature. The first issue is whether the Court of Appeals erred in reversing the trial court's entry of judgment notwithstanding the verdict in favor of defendant on two of the issues submitted to the jury. The answer is no. The second issue is whether the Court of Appeals erred in reversing the trial court's alternative grant of a new trial for defendant. The answer is yes.

## FACTS

On 20 September 1980, defendant, Nationwide Mutual Fire Insurance Company, issued a fire insurance policy insuring the dwelling and contents owned by plaintiffs, Teddy Ray and Oma P. Bryant. The insured property was located near Pinnacle, within Stokes County. At approximately 4:30 a.m. on 14 April 1981, while plaintiffs' policy was in full force and effect, plaintiffs' insured dwelling and contents were totally destroyed by fire. The evidence at trial tended to show that Mr. Bryant had taken his family to his brother-in-law's house in Mt. Airy, approximately twelve miles from Pinnacle, the evening before. One of the reasons, according to Mr. Bryant, for going to Mt. Airy was to work on a painting job for a Mrs. Grover Hyatt; however, Mrs. Hyatt testified and denied ever hiring or even knowing Mr. Bryant. Plaintiffs were notified of the fire at approximately 6:30 a.m. the morning of 14 April 1981. At approximately 10:00 a.m. that same morning, a detective and arson expert with the State Bureau of Investigation arrived at the scene of the fire to investigate its origin and cause. It was the opinion of the SBI detective that the fire was incendiary in nature, i.e., a fire nonaccidental in nature and that is intentionally caused.

Roger Cranford, a large loss adjuster for Nationwide, testified that he was contacted the following morning about the fire and that the fire was being investigated by the local authorities. After receiving a company report, Mr. Cranford contacted Mr. Bryant and conducted a recorded telephone interview on 16 April 1981. Mr. Bryant expressly consented to the interview being recorded. According to Mr. Cranford, the purpose of this interview was "to try and determine where the insured was, possibly how the fire happened, and financial conditions of the insured."

During this telephone interview, Mr. Bryant was asked general questions regarding his personal background and family, the approximate value of his home and its contents, circumstances surrounding the fire and its possible cause, and the value of his assets. Although he was not specifically asked to enumerate any debts, he was asked whether his mortgage was current and if he owed "anybody any money that they've come and asked you for . . . ." Additionally, Mr. Bryant stated that he was married to Oma P. Bryant, when, in fact, he was still legally married to his first wife, Eunice. Teddy and Oma Bryant had lived together for fifteen years and were the parents of three children. In May 1982, approximately one year later, they did become legally married.

On or about 3 June 1981, plaintiffs prepared and submitted a proof of loss form to Nationwide. On the proof of loss form plaintiffs listed three mortgages, Bank of Pilot Mountain, J. R. Jessup, and Ronnie Bennett, as encumbrances on the insured property. No other portion of this form required that the insured list additional outstanding debts. Afterwards, on 1 July 1981, a sworn statement was obtained by Nationwide's attorney from both plaintiffs. During this question-and-answer period, plaintiffs estimated their debts to be approximately $22,293. This sum included the three mortgages that had previously been listed on plaintiffs' proof of loss form dated 3 June 1981, plus five outstanding judgments. Mr. Bryant also stated that he and Oma had never been legally married.

On 14 August 1981, plaintiffs instituted an action against Nationwide, claiming that defendant "has failed and refused to pay to the plaintiffs the amounts due to them under its policy of insurance . . . ." Nationwide denied coverage in its answer and alleged *inter alia* that plaintiffs deliberately set the fire and made repeated material misrepresentations to defendant during investigation of the fire. Nationwide based its defense of misrepresentation on the answers given by plaintiffs during the foregoing interview sessions and the results of their independent investigations of the claim.

During May 1982, after this action was commenced and approximately five months prior to trial, Nationwide took the deposition of Mr. and Mrs. Bryant. These depositions were not introduced into evidence at trial but were referred to during cross-

examination of plaintiffs. In this pre-trial deposition, Mr. Bryant revealed for the first time the existence of a disputed debt in the amount of $5,000 or $6,000 that he owed to a Mrs. Effie Stanley. At trial Mr. Bryant testified that the amount he owed to Mrs. Stanley should actually be reduced by $3,000 and offered the following explanation:

> Mrs. Stanley wanted her son — none of her kids lived in the country near her, they all live in other states. She wanted to buy my house for her son. She paid me three thousand dollars to hold the house for her for a period of, I don't know, I think maybe sixty days. She gave me the three thousand dollars. Her son couldn't come up with the money to buy the house with, which I was not obligated to give her the three thousand back, but I decided it would be wrong for me to keep it. So I just considered myself owing her that three thousand back . . . .

The evidence at trial further tended to show that prior to the fire Mr. Bryant actually owed an undisputed amount of approximately $27,000,[1] comprised primarily of debts in excess of $25,000 previously revealed by plaintiffs during pre-trial interviews. Additional debts totalling approximately $1,300, which had not been referred to by plaintiff in earlier interviews, were disclosed at trial. At the close of plaintiffs' evidence, defendant moved for a directed verdict, which was denied by the trial judge. At the close of all the evidence, both parties' motions for directed ver-

---

1. The amount owed ranged from this undisputed low to a high of approximately $50,000, a figure that included certain amounts allegedly owed by Mr. Bryant but subject to dispute and uncertainty. The largest amount in dispute, approximately $19,500, was the subject of a pending breach of contract action against Mr. Bryant. There was testimony tending to show that Mr. Bryant had leased a car wash from the J. A. Eads Company on 10 October 1980, and thereafter defaulted by failing to pay the monthly rent. Defendant stipulated that at the time of the fire he owed $1,660 to the company for past rental payments. Defendant argues that the remaining rental payments due under the lease constituted a "possible total liability" owed by defendant of over $19,000. However, plaintiff denied liability for future rental payments, contending that the J. A. Eads Co. had "misled me on the car wash completely," thus breaching the provisions of the lease. The total amount due under this lease is speculative in nature and has not been reduced to judgment. Therefore, such sum should not be considered a current debt owed by Mr. Bryant at the time of the fire, since Mr. Bryant's liability, if any, for this sum had not been legally determined.

dicts were denied. The trial judge submitted three issues to the jury, which were answered as follows:

> 1. Did the plaintiffs Teddy Ray Bryant and Oma P. Bryant burn or procure the burning of their dwelling?

ANSWER: NO

> 2. Did the plaintiffs Teddy Ray Bryant and Oma P. Bryant swear falsely or make material misrepresentations in connection with any matter pertinent to their claim for insurance proceeds?

ANSWER: NO

> 3. What amount of damages, if any, are the plaintiffs entitled to recover of the defendant?

> (a) For real property $34,750

> (b) For personal property $12,500

> (c) For additional living expenses $0

After return of the jury verdict for plaintiffs, plaintiffs moved for judgment notwithstanding the verdict on issue 3(a), or in the alternative, for a new trial on that same issue. This motion was denied by the trial judge. Defendant's motions for judgment notwithstanding the verdict and a conditional new trial were allowed "as to the second and third issues on the ground that the verdict is contrary to the greater weight of the evidence and that defendant is entitled to judgment as a matter of law." Furthermore, the court ordered a new trial as to those two issues in the event that judgment notwithstanding the verdict in defendant's favor was subsequently vacated or reversed. Plaintiffs appealed to the Court of Appeals. That court reversed the judgment of the trial court and remanded the case with instructions that judgment for the plaintiffs be entered on the jury's verdict. Defendant filed a petition for rehearing with the Court of Appeals, which was denied. This Court subsequently granted defendant's petition for discretionary review pursuant to G.S. 7A-31.

## I.

### RULE 50: JUDGMENT NOTWITHSTANDING THE VERDICT

Rule 50 of the North Carolina Rules of Civil Procedure is entitled: *Motion for a directed verdict and for judgment notwithstanding the verdict.* It provides in pertinent part as follows:

> (b) *Motion for Judgment Notwithstanding the Verdict.—*
>
> (1) Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the submission of the action to the jury shall be deemed to be subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. In either case, the motion shall be granted if it appears that the motion for directed verdict could properly have been granted. . . .

Defendant argues that the Court of Appeals should not have reversed the trial judge's entry of judgment notwithstanding the verdict on the second and third issues pursuant to Rule 50(b) of the North Carolina Rules of Civil Procedure. The Court of Appeals did not directly address nor advance its reasoning for reversing the trial court's entry of judgment notwithstanding the verdict in favor of defendant. Although the Rule 59 motion in the alternative to set aside the verdict and for a new trial was dealt with in that court's opinion, the only apparent justification for reversing the Rule 50(b) motion seems to be because "[i]t is clear that there was sufficient evidence to support the jury's verdict . . . ." *Bryant v. Nationwide Mutual Fire Insurance Co.,* 67 N.C. App. 616, 622, 313 S.E. 2d 803, 808 (1984). It thus becomes the duty of this Court to review the applicable law and determine whether the trial judge erred in granting defendant's motion pursuant to Rule 50(b).

Our analysis begins with a review of certain basic principles applicable to a Rule 50(b) motion. First, such a motion is essential-

ly a renewal of an earlier motion for directed verdict. *Dickinson v. Pake*, 284 N.C. 576, 201 S.E. 2d 897 (1974). Accordingly, if the motion for directed verdict could have been properly granted, then the subsequent motion for judgment notwithstanding the verdict should also be granted. *Manganello v. Permastone, Inc.*, 291 N.C. 666, 231 S.E. 2d 678 (1977) (cited in 90 A.L.R. 3d 525). In considering any motion for directed verdict, the trial court must view all the evidence that supports the non-movant's claim as being true and that evidence must be considered in the light most favorable to the non-movant, giving to the non-movant the benefit of every reasonable inference that may legitimately be drawn from the evidence with contradictions, conflicts, and inconsistencies being resolved in the non-movant's favor. *Farmer v. Chaney*, 292 N.C. 451, 233 S.E. 2d 582 (1977). This Court has also held that a motion for judgment notwithstanding the verdict is cautiously and sparingly granted. *Investment Properties of Asheville, Inc. v. Allen*, 281 N.C. 174, 188 S.E. 2d 441 (1972), *rev'd on other grounds*, 283 N.C. 277, 196 S.E. 2d 262 (1973). It is also elementary that the movant for a Rule 50(b) motion must make a motion for directed verdict at the close of all the evidence. *Whitaker v. Earnhardt*, 289 N.C. 260, 221 S.E. 2d 316 (1976). And finally where, as in the case *sub judice*, defendant has the burden of proof on its affirmative defense of misrepresentation, the granting of a directed verdict or judgment notwithstanding the verdict will be more closely scrutinized. *North Carolina National Bank v. Burnette*, 38 N.C. App. 120, 247 S.E. 2d 648 (1978), *rev'd on other grounds*, 297 N.C. 524, 256 S.E. 2d 388 (1979).

In the present case, the statutory provision of G.S. 58-176(c) was controlling on Issue 2, that is, whether plaintiffs had made material misrepresentations that would void the policy. That statute provides:

> This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or in the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

[1] Generally, this is referred to as a fraud and false swearing provision. *See* R. Keeton, *Basic Text on Insurance Law* § 7.2(b)

(1971). As is true in the present case, many insurers raise misrepresentation as a basis for an affirmative defense and seek to void the policy on that ground. R. Keeton, *supra*. To prevail in its defense, the insurance company must prove the insured made statements that were: 1) false, 2) material, and 3) knowingly and willfully made. *Watkins v. Continential Insurance Companies*, 690 F. 2d 449, 451 (5th Cir. 1982). Relative to these elements, the trial judge charged the jury as follows:

> Now, ladies and gentlemen of the jury, the second issue reads, did the plaintiffs, Teddy Ray Bryant and Oma P. Bryant swear falsely or make material misrepresentations in connection with any matter pertinent to their claim for insurance proceeds? On this issue, likewise, the burden of proof lies on the defendant. And likewise you will answer this issue either yes or no.
>
> . . . .
>
> Now, the defendant, Nationwide Mutual Fire Insurance Company, contends that the plaintiffs made material representations with regard to the insured premises, and that [sic] their interest therein, as well as the value of the premises. The defendant therefore contends that these material representations void the policy and alleviate Nationwide from any liability. Conversely, of course, the plaintiffs contend that they did no such thing and that if they made any misrepresentations they were simply innocent mistakes and that they were not intentional and that they were not material.
>
> . . . .
>
> Under the law a willful and intentional misrepresentation of the extent of the fire loss, or a willful and intentional misrepresentation as to the interest of the insured in the premises, or the value thereof, with the intention of deceiving the insurer, will preclude any recovery on the policy. I instruct you, members of the jury, that a mere overstatement of value of the goods or premises lost in a fire, or an error in judgment with respect to their value, is not sufficient to prove an intentional misrepresentation. On the other hand, if the insureds knowingly made false statements to Nationwide with regard to a material matter, the law infers or presumes that the insured intended to deceive the insurer, Nationwide.

Further, I instruct you that it is not necessary for the insurer, Nationwide, to be actually deceived, prejudiced, or injured by the false or fraudulent statements made by the insured in order to void the policy of insurance. Therefore, you need not be persuaded that Nationwide relied or acted upon the statements of the insured to its detriment, it being sufficient to void the policy that the plaintiffs made material representations knowing them to be false. Further, if the plaintiffs failed to disclose an encumbrance or lien existing on the policy or misled the defendant with regard to its existence, then the policy of insurance is void and the plaintiffs are not entitled to recover from the defendant.

Now, members of the jury, a misrepresentation is material if the facts misrepresented would reasonably be expected to influence the decision of the defendant insurance company in investigating, adjusting or paying the claim of the plaintiffs.

. . . .

Finally with respect to the second issue, I instruct you that if you are persuaded by the greater weight of the evidence that the plaintiffs made material misrepresentations to Nationwide, the defendant, with the intent to deceive the defendant, Nationwide, or swore falsely in connection with the policy or the house or the claim, then you should answer the second issue yes in favor of the defendant. However, if you are not so persuaded by the greater weight of the evidence or you are unable to tell where the truth lies, then you should answer the second issue no in favor of the plaintiffs.

We consider the substance of these instructions, read in context with the remaining charges to the jury, to accurately explain the applicable law for consideration by the jury. Furthermore, we note that neither party contends that any of the trial court's instructions were erroneous. Hence, the pivotal question to be resolved is simply whether the evidence was of such a character that reasonable men could form divergent opinions of its import, thereby justifying submission of the issues to the jury. *Brewer v. Majors*, 48 N.C. App. 202, 268 S.E. 2d 229, *disc. review denied*, 301 N.C. 400, 273 S.E. 2d 445 (1980).

[2]  A review of the evidence relative to the issue of fraud and false swearing convinces this Court that such evidence, when viewed in a light more favorable to the plaintiffs, the non-movants, was sufficient to support a jury finding that plaintiffs did not swear falsely or willfully make material misrepresentations during the investigation of their claim by defendant. There was clearly conflicting evidence as to whether plaintiffs knowingly and willfully made material misrepresentations of fact, all essential elements to prove fraud and false swearing.

Defendant argues that plaintiffs' misrepresentation of their marital status and financial condition at the time of the fire should void coverage pursuant to G.S. 58-176(c). The evidence established that Mr. Bryant did misrepresent his marital status when he first spoke with defendant's adjuster during the initial telephone interview. However, this was corrected in Mr. Bryant's subsequent sworn statement of 1 July 1981. Defendant contends that such a misrepresentation was material because it led defendant to assume that the risk insured was entireties property rather than property held as tenants in common. It is true that the deed to plaintiffs' dwelling was in the names of both Mr. and Mrs. Bryant as tenants in common. As tenants in common, it is clear that both would have an insurable interest in the property.

First, since Mr. Bryant corrected his original misstatement in his later sworn statement taken by defendant on 1 July 1981, the jury could reasonably question whether the prior statement constituted any misrepresentation whatsoever. Secondly, if the jury did consider the statement a misrepresentation, there is a question of whether it was material in nature. Certainly the jury could have reasonably concluded that the question of marriage or non-marriage could not have reasonably influenced defendant's decisions in investigating, adjusting, or paying the claim.

Further evidence established that the Bryants fully informed defendant of the existence of $22,293 in debts and obligations existing prior to the time of the fire. During the 16 April 1981 telephone interview, defendant's first contact with the insured, Mr. Bryant was not asked to estimate or enumerate any of his debts. Despite defendant's failure to specifically ask about debts, defendant contends that the initial telephone interview revealed material misrepresentations on the part of Mr. Bryant when he was asked the following:

Q. Okay, are you current with your mortgage?

A. I guess, well, I've got one payment behind.

Q. How about the rest of your financial status, sir? In other words, do you owe anybody any money that they've come and asked you for or anything of that nature?

A. No sir.

Q. Okay, do you have any other bills?

A. No, other than just normal bills.

During trial, Mr. Bryant, when confronted on cross-examination with the above statements given during the telephone interview with Mr. Cranford, stated and explained as follows:

Q. And you remember talking to Mr. Roger Cranford and giving him a recorded statement on April 16, 1981?

A. Yes, sir. Yes, sir.

. . . .

Q. Do you recall being asked by him, this question, "Okay, do you have any other bills?" Do you remember that question?

. . . .

Q. The question, "Okay, do you have any other bills?" And your answer, "No, other than just normal bills."

A. That was the embarrassing question that Mr. Cranford asked me.

Q. That was an embarrassing question?

A. Yes. And I was thinking Mr. Cranford meant light bills, water bills.

Q. Well, he had already asked you about your light bills earlier, hadn't he?

A. That's what I thought he was still getting at.

. . . .

A. Well, it was in still the frame of my mind that he was asking about the bills that I received every month.

. . . .

Q. Now, you had some other debts also, didn't you, sir, at the time this fire occurred?

A. What kind of debts you talking about?

Q. Well, debts you didn't mention to Mr. Cranford when he asked you about other bills you had outstanding. About Boles Hardware Company, Yadkin Well Company, Dixie Concrete Company. Do you recall those?

A. He didn't ask me about them.

Q. About outstanding bills you had?

A. He may have said something about outstanding bills, but it certainly wasn't in my mind that he was wanting me to tell him who I owed. I mean like Dixie Concrete. That wasn't the picture I was getting on what he was asking me.

. . . .

Q. And you never told Mr. Cranford or Mr. Comerford one word at any time about J. A. Eades Company, did you? Not on the recorded statement, not on the sworn statement, and not when he took your deposition just this summer. You didn't even mention it then, did you?

A. Well, I wasn't trying to hide it.

Q. Well, when they asked you about debts you had outstanding, you didn't tell them about it, did you?

A. Well, I didn't think about it.

A jury could infer from the foregoing testimony that Mr. Bryant's statements were not willful or knowing. "To 'willfully misrepresent' is to make a statement deliberately and intentionally knowing it to be false." 12A Appleman, *Insurance Law and Practice* § 7300 at 404 (1981). The trial judge's instructions to the jury on the element of willfulness was essentially in conformance with the foregoing definition. Such an inference by the jury could very well be attributable also to the limited education of Mr. Bryant. Mr. Bryant in fact testified on cross-examination that he had completed formal schooling only through the fifth grade. Thus, the jury was entitled to consider what role, if any, Mr. Bry-

ant's limited education might have played in his understanding of defendant's question during the course of the investigation. His difficulty in understanding the questions propounded to him by defendant's attorneys is apparent in other areas of his testimony.

Q. Have you got any debts outstanding right now?

A. Now?

Q. Other than those two?

A. Not outstanding, no.

Q. Okay. You don't owe anybody any money?

A. Oh, yes. I owe some people; sure.

Q. Okay. Could you tell me who these people are?

A. Well, I owe the Yadkin Well Company, and I owe Dixie's Concrete Company, and I owe Harold Boles.

Mr. Bryant next correctly indicated the amounts owed to these three creditors.

Bearing on the element of willfulness, the jury may have inferred from the foregoing testimony that Mr. Bryant did not even understand the use of the word "outstanding" in relation to debts. During trial, Mr. Bryant further testified as follows:

Q. Do you recall being asked in your sworn statement here, now this is the one Mr. Comerford took in July, the first day of July, right after your fire. Question, "Okay, have you ever been involved in any lawsuits?" Answer, "No, sir."

A. That's right. I answered that, I hadn't been involved in any lawsuits.

Q. As a matter of fact, seven lawsuits had been filed against you, six of which had been reduced to judgment, at the time this fire occurred, isn't that right?

A. They were filed against me, but what I was thinking Mr. Comerford meant had I ever appeared in court.

. . . .

Q. But that's not what he asked you, is it, sir? He asked you if you had ever been involved in any lawsuits, and you said no.

A. I might have, but to the best of my knowledge I had not been involved in no lawsuit.

. . . .

And during further testimony:

A. Let's go back up here and let me explain this thing.

Q. All right, you go ahead and explain.

A. All right, sir. "Okay, have you ever been involved in any lawsuit?" I said, "No, sir." Which in my way of thinking he meant had I been into court into a lawsuit. I can't, I've got a fifth grade education. I can't compete with you lawyers.

. . . .

Q. The next question, "All right, sir, but you have never had a civil action brought against you to recover any money?" And your answer, "No," is that right?

A. To the best of my knowledge it wasn't. That was a true answer.

. . . .

Q. You had seven of them against you at the time, didn't you?

A. I had never been to court, is what I was thinking you was meaning when I said, "No, sir," to the lawsuit.

Q. But you had seven of them pending against you at the time, didn't you?

A. Well, the lawyers' terms they are lawsuits, that's the opinion —

From this testimony, a jury could have concluded that Mr. Bryant did not understand or have any concept of what a civil action or lawsuit meant when these questions were asked of him. Thus, the jury may have reasonably inferred that Mr. Bryant did not willfully and knowingly misrepresent any facts, even if they were material. The jury was certainly at liberty to reject defendant's contention that Mr. Bryant willfully concealed or misrepresented facts regarding lawsuits and his finances.

During the telephone interview, sworn statement, pretrial deposition, and trial, Mr. Bryant was asked repeatedly by defense counsel whether his creditors were "pressing" him for payment. Mr. Bryant's response to intensive questioning regarding his denial of being pressured by his creditors and his interpretation of the meaning of such questions are illustrated by the following testimony:

> Q. Sir, do you recall being asked this question on your deposition, "Well, you were receiving quite a bit of pressure from your creditors along around April of 1981, were you not, sir?" And your answer, "No, sir, I—none unusual. Nobody was trying to foreclose or anything like that."
>
> A. That's exactly right.
>
> Q. Next question, "You would say that there was nothing unusual about your financial situation as of April, 1981?" And your answer, "I'd say, well, I would say I owed people but they wasn't pressuring me to, you know, very much about it."
>
> A. Uh, huh. That's—I've stated it true.

Following this same theme of questioning, Mr. Bryant was specifically asked about judgments:

> Q. Dixie Concrete Company also had a claim against you and reduced it to judgment for fourteen hundred eighty-eight dollars and fifty-three cents, isn't that right?
>
> A. Yes, sir.
>
> Q. They did that before this fire occurred, didn't they?
>
> A. I suppose so.
>
> . . . .
>
> Q. And you got pressured from Dixie Concrete to pay that bill, didn't you?
>
> A. No more pressure than just what he had filed suit. That's all. He didn't call me or come to my house or anything like that.
>
> Q. Well, you got a letter saying if you don't pay it you are going to be sued? Don't you recall that?

A. I probably did.

Q. And you don't consider that being pressured to pay it?

A. No, I don't. No.

The foregoing questions concerning Mr. Bryant's idea of "pressure" from creditors seem to call for a response in the form of an opinion rather than a fact. Whether or not Mr. Bryant's opinion was an honest one was a matter for the jury to consider. Additionally, Mr. Bryant's testimony during the trial spans nearly two hundred pages in the transcript, and his sworn statement taken prior to trial consisted of seventy pages of continuous questions and answers. Within the sworn statement alone, Mr. Bryant revealed to Nationwide during their initial investigation a substantial majority of his actual total outstanding debts and obligations. Considering the extensive questioning, reasonable men could also certainly form differing opinions about whether Mr. Bryant related his financial circumstances to the best of his ability, considering the average person's capacity to remember figures and amounts with precision.

When plaintiffs have made out a case sufficient to go to the jury, as did plaintiffs in the present case, it is error for the trial court to enter judgment for the defendant notwithstanding the verdict. *Horton v. Iowa Mutual Insurance Company*, 9 N.C. App. 140, 75 S.E. 2d 725 (1970). Since plaintiffs' evidence was sufficient to withstand defendant's earlier motion for a directed verdict, the trial court's entry of judgment notwithstanding the verdict was improper on the question of misrepresentation. *Norwood v. Sherwin Williams Company*, 303 N.C. 462, 279 S.E. 2d 559 (1981). Thus, the Court of Appeals did not err in reversing the trial court's entry of judgment notwithstanding the verdict on the second issue. Although the trial judge also granted defendant's Rule 50 motion for judgment notwithstanding the verdict as to the third issue, damages, defendant did not argue this issue in its brief. Pursuant to Rule 28(a) of the North Carolina Rules of Appellate Procedure, this question is deemed abandoned.

### RULE 59: MOTION FOR NEW TRIAL

[3] In the case *sub judice*, defendant prayed for a new trial in the alternative pursuant to Rules 50 and 59. Rule 50 provides in relevant part as follows:

(b) *Motion for judgment notwithstanding the verdict.—*

A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative . . . .

Rule 50 further provides:

(c) *Motion for judgment notwithstanding the verdict— Conditional rulings on grant of motion.—*

(1) If the motion for judgment notwithstanding the verdict, provided for in section (b) of this rule, is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial had been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate division has otherwise ordered.

Rule 59 lists the grounds available for a new trial. Defendant premised its motion on Rule 59(a)(7), "insufficiency of the evidence to justify the verdict . . . ." Also, the trial judge premised his decision to grant defendant's motion for a new trial on this ground as stated in his order:

3. In the event that this judgment in defendant's favor is hereafter vacated or reversed, it is hereby ordered, pursuant to Rule 50(c) . . . that defendant be granted a new trial . . . because the verdict in this case was contrary to the greater weight of the evidence and the evidence was insufficient to justify the verdict.

When a motion for judgment notwithstanding the verdict is joined with a motion for a new trial, it is the duty of the trial court to rule on both. *Graves v. Walston*, 302 N.C. 332, 275 S.E. 2d 485 (1981). It is evident that the trial judge did just that in this case.

The trial judge indicated that he was granting the motion in his discretion when he responded to defense counsel's questions while ruling on the parties' motions:

MR. COMERFORD: All right, as to the first issue, we would first ask the Court to enter a judgment for the defendant pursuant to Rule 50.

COURT: Surely.

MR. COMERFORD: And in the alternative to set aside the verdict pursuant to Rule 59.

COURT: Well, I'm going to grant the motion for verdict notwith—for judgment notwithstanding the verdict, as to the second issue . . . . Now, then—as being against the greater weight of the evidence and in my discretion I'm going to set the second issue aside, it being in my discretion, and therefore the third issue in its entirety because I think that that was tied up with that. I just can't help but come to the conclusion that there was just too much evidence that there were misrepresentations.

Therefore, this Court's scope of review is limited to determining whether the trial judge abused his discretion in ordering a new trial because of insufficient evidence. The law is summarized as follows:

It has been long settled in our jurisdiction that an appellate court's review of a trial judge's discretionary ruling either granting or denying a motion to set aside a verdict and order a new trial is strictly limited to the determination of whether the record affirmatively demonstrates a manifest abuse of discretion by the judge. *Goldston v. Chambers*, 272 N.C. 53, 59, 157 S.E. 2d 676, 680 (1967); *see e.g. Bryant v. Russell*, 266 N.C. 629, 146 S.E. 2d 813 (1966); *Robinson v. Taylor*, 257 N.C. 668, 127 S.E. 2d 243 (1962); *Dixon v. Young*, 255 N.C. 578, 122 S.E. 2d 202 (1961); *Caulder v. Gresham*, 224 N.C. 402, 30 S.E. 2d 312 (1944). The legislative enactment of the Rules of Civil Procedure in 1967 did not diminish the inherent and traditional authority of the trial judges of our state to set aside the verdict whenever in their sound discretion they believe it necessary to attain justice for all concerned, and the adoption of those Rules did not enlarge the scope of appellate review

of a trial judge's exercise of that power. *Britt v. Allen*, 291 N.C. 630, 634-35, 231 S.E. 2d 607, 611-12 (1977), *see also Insurance Co. v. Chantos*, 298 N.C. 246, 253, 258 S.E. 2d 334, 338-39 (1979) (Huskins, J., dissenting). The principle that appellate review is restricted in these circumstances is so well established that it should not require elaboration or explanation here. . . .

*Worthington v. Bynum*, 305 N.C. 478, 482, 290 S.E. 2d 599, 602 (1982).

A ruling in the discretion of the trial judge raises no question of law. *Britt v. Allen*, 291 N.C. 630, 231 S.E. 2d 607 (1977). A review of the record in the present case demonstrates no manifest abuse of discretion by the trial judge. Therefore, the ruling of the trial judge will not be disturbed on this appeal. *See, e.g., Worthington v. Bynum*, 305 N.C. 478, 290 S.E. 2d 599 (1982) (this case contains a thorough discussion of the trial judge's discretionary power pursuant to Rule 59 and thoroughly covers the ramifications of that rule).

We disagree with the Court of Appeals' interpretation of the trial judge's ruling on this motion. The Court of Appeals, in its opinion, stated that "where the trial court grants the Rule 59 motion based on an issue of law, its decision may be fully reviewed on appeal." *Bryant*, 67 N.C. App. at 620, 313 S.E. 2d at 807. The following language, taken from the trial judge's dialogue with the attorneys while ruling on the post-trial motions, was then quoted by the Court of Appeals: " '[t]here were too many misrepresentations, and there's no question that they were material . . . .' " *Id.* This phrase influenced the Court of Appeals and seemed to convince that court that the court's ruling below involved an issue of law, which was fully reviewable on appeal.

The Court of Appeals seems to be laboring under the misapprehension that defendant's motion was pursuant to Rule 59(a)(8), an additional ground for granting a new trial for an "[e]rror in law occurring at the trial and objected to by the party making the motion . . . ." The Court of Appeals cited *In re Will of Herring*, 19 N.C. App. 357, 198 S.E. 2d 737 (1973) to support its conclusion and holding that the Rule 59 motion is fully reviewable, because it was "based on an issue of law. . . ." *Bryant*, 67 N.C. App. at 620, 313 S.E. 2d at 807. The court below seems to equate an "issue of

law" to an "error in law." For purposes of a Rule 50(a)(8) motion, the two phrases are not interchangeable. Clearly, defendant's motion and the trial judge's order were not premised upon Rule 59(a)(8).

The order in *In re Will of Herring* is illustrative of how a Rule 50(a)(8) motion differs significantly from a Rule 50(a)(7) motion. The trial judge in that case granted the Rule 50(a)(8) motion and stated explicitly in his order "that errors of law were committed by the Court during the trial which were materially prejudicial to the caveators." *Id.* at 359, 198 S.E. 2d at 739. In that case the Court of Appeals, after noting that the motion was made pursuant to Rule 59(a)(8), stated that such order was defective because it failed to "specif[y] the errors of law committed during the trial which were prejudicial to the caveators." *Id.* at 360, 198 S.E. 2d at 740.

Specificity in the trial judge's order pursuant to Rule 50(a)(8) is mandatory if the trial judge's decision is to be completely reviewable. W. Shuford, *North Carolina Civil Practice and Procedure* § 59.12 (1981). Without the trial judge making precise reference to the errors of law committed during the trial *and* objected to by the party making the motion, an appellate court "would be forced to embark on a voyage of discovery through an unchartered record to find the errors of law referred to in the order." (Citations omitted.) *In re Herring*, 19 N.C. App. at 360, 198 S.E. 2d at 740.

In the case *sub judice*, the trial judge in his order made no intimation that he was granting a new trial for an error of law. Furthermore, there was no specific error identified in the record or in the judge's order. Neither did the defendant, the party making the motion for a new trial, object to or specify any error of law that was made, as required by Rule 59(a)(8). Absent a valid motion pursuant to Rule 59(a)(8) and an order granting such motion for errors of law specifically identified, the Court of Appeals erred in reversing the trial judge's conditional grant of a new trial absent a manifest abuse of discretion. "[A]n appellate court should not disturb a discretionary Rule 59 order unless it is reasonably convinced by the cold record that the trial judge's ruling probably amounted to a substantial miscarriage of justice." *Worthington*, 305 N.C. at 487, 290 S.E. 2d at ---. In the present case the trial judge did not abuse his discretion.

The Court of Appeals, after finding the trial judge's ruling fully reviewable because it "involved an issue of law," proceeded to formulate a legal definition of the term "material" as used in G.S. 58-176(c). Because the judge's order in the trial court was not premised upon an error of law, it was unnecessary for the Court of Appeals to define such term and consider the question of whether plaintiffs' misrepresentations were "material." The Court of Appeals failed to examine the trial judge's definition of materiality contained in his instructions to the jury and decide if such an instruction was erroneous in the first instance. It is evident from the transcript that both parties agreed to the following definition:

Now, members of the jury, a misrepresentation is material if the facts misrepresented would reasonably be expected to influence the decision of the defendant insurance company in investigating, adjusting or paying the claim of the plaintiffs.

Furthermore, this definition seems to be a correct statement of the law and compatible with definitions developed by other jurisdictions when materiality and false swearing is an issue. *See, Long v. Insurance Company of North America,* 670 F. 2d 930 (10th Cir. 1982); *accord Fine v. Bellefonte Underwriters Insurance Company,* 725 F. 2d 179 (2d Cir. 1984); *Claflin v. Commonwealth Insurance Company,* 110 U.S. 81 (1984); *but cf.,* A. Windt, *Insurance Claims and Disputes* § 306 (1982) (the author observes that there is "no rule of thumb" for determining whether a fact concealed or misrepresented is material); *Watkins v. Continential Insurance Companies,* 690 F. 2d 449 (5th Cir. 1982) (in the context of false swearing statutes, this court admitted that "an explicit and workable definition of 'materiality' useful in the present case . . . has not emerged from the Mississippi courts," despite a wealth of case law addressing this issue. *Id.* at 452).

Accordingly, the portion of the Court of Appeals' opinion reversing the trial court's ruling in favor of defendant on the Rule 50 motion is affirmed because there was sufficient evidence to go to the jury on the second issue of whether plaintiffs' statements were material and willful misrepresentations of fact. However, since the Court of Appeals erroneously reversed the trial court's discretionary ruling in favor of defendant pursuant to

Rule 59(7), that portion of the Court of Appeals' decision is reversed and the case is remanded to the Court of Appeals for further remand to the trial court for a new trial on the second and third issues.

Affirmed in part; reversed in part and remanded.

Justice VAUGHN did not participate in the consideration or decision of this case.