IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-552

Filed 2 July 2025

Mecklenburg County, No. 17 CVS 017308-590

MARK W. PONDER, Plaintiff,

v.

STEPHEN R. BEEN, Defendant.

Appeal by defendant from order entered 14 December 2023 by Judge Nathan J. Poovey in Superior Court, Mecklenburg County. Heard in the Court of Appeals 13 February 2025.

> *Sodoma Law, P.C., by Amy E. Simpson and Caitlin H. Hickman, for plaintiff-appellee.*

> *Womble Bond Dickinson (US) LLP, by James P. Cooney III and Patrick Grayson Spaugh, for defendant-appellant.*

STROUD, Judge.

This matter is before us following a jury verdict finding Stephen Been ("Defendant") not liable for alienation of affections and Mark Ponder ("Plaintiff") liable for abuse of process. The jury awarded Defendant compensatory and punitive damages, and Plaintiff moved for judgment notwithstanding the verdict ("JNOV"). The trial court granted Plaintiff's motion and Defendant appealed. We reverse the trial court's order setting aside the jury verdict.

## I. Factual and Procedural Background

The factual background and procedural history of this case were set forth by this Court in *Ponder v. Been,* 275 N.C. App. 626, 853 S.E.2d 302 (2020) (*"Ponder I"*). We briefly summarize *Ponder I*, the Supreme Court's subsequent reversal, and the additional facts now pertinent to Defendant's argument on appeal. The relevant facts from *Ponder I* are as follows. *See id*. at 626-628, 853 S.E.2d at 304.

Plaintiff met Mary in 2008, and they married in June 2010. Mary had two children from a prior marriage, John[1] and Max, and worked in the home as a stay-at-home mother. Plaintiff owned a home in Naples, Florida and Mary occasionally vacationed alone at the home. During one of her visits in May 2013, Mary met Defendant, who lived nearby. Following this visit, Mary and Defendant remained in frequent contact through text messages and telephone calls.

In November 2013, Plaintiff confronted Mary and accused her of having an affair with Defendant. This encounter resulted in Mary seeking a domestic violence protection order against Plaintiff. On 13 November 2013, the order was granted and Mary and Plaintiff separated. After their separation, Mary remained in the marital home until June 2014, when she and her children moved to Naples, Florida and lived in properties owned by Defendant.

On 5 November 2015, Plaintiff filed a complaint against Defendant alleging alienation of affections. Plaintiff voluntarily dismissed this action on 15 September

---

[1] We have used pseudonyms to protect the identities of the children.

2016 after Defendant moved to dismiss for lack of personal jurisdiction. On 14 September 2017, Plaintiff refiled his claim for alienation of affections against Defendant, seeking compensatory and punitive damages. Plaintiff alleged "[w]ith full knowledge of her marital status, Defendant, willfully, maliciously and intentionally engaged in a campaign to alienate [Mary] from Plaintiff," which severed Plaintiff and Mary's marital bond. In response, Defendant again moved to dismiss Plaintiff's action for lack of personal jurisdiction, citing a violation of North Carolina's long-arm statute, North Carolina General Statute Section 1-75.4.

On 29 October 2019, the trial court entered its order denying Defendant's motion to dismiss for lack of personal jurisdiction. Defendant appealed. On 31 December 2020, with a divided panel, this Court in *Ponder I* reversed the trial court's order. *Ponder I*, 275 N.C. App. at 635, 853 S.E.2d at 308. On 11 March 2022, our Supreme Court reversed this Court's decision in *Ponder I* for the reasons discussed in the dissenting opinion. *Ponder v. Been,* 380 N.C. 570, 869 S.E.2d 193 (2022). Thus, consistent with the dissenting opinion in *Ponder I*, the trial court's order denying Defendant's motion to dismiss for lack of personal jurisdiction was affirmed.

Following the issuance of the Supreme Court's decision, on 20 April 2022 Defendant filed an answer to Plaintiff's 2017 complaint for alienation of affections. Defendant also asserted a counterclaim against Plaintiff for abuse of process and sought an award of punitive damages. The basis of his claim arose from Plaintiff's service of process of the 14 September 2017 complaint. Defendant alleged that on 28

October 2017 Plaintiff appeared at Defendant's home, allegedly to locate Defendant to serve him with the complaint. Plaintiff was highly intoxicated when he arrived and he initiated an altercation involving Defendant, Mary, and Mary's son. Following the altercation, a court in Florida issued a domestic violence protection order against Plaintiff. Defendant alleged that Plaintiff used the service of his complaint as a pretextual basis for appearing at his home.

The trial on Plaintiff's alienation of affections claim and Defendant's abuse of process counterclaim spanned 14 August 2023 to 24 August 2023. The evidence presented at trial regarding the background of this matter and Defendant's abuse of process claim tended to show the following.[2]

After Plaintiff and Mary wed in 2010, Plaintiff engaged in verbal, physical, and emotional abuse toward Mary on a daily basis. The severity of the abuse worsened as Plaintiff began consuming alcohol heavily about six out of seven days per week. Mary's sons, who were ages 6 and 7 in 2010, often witnessed the abuse and experienced it themselves. Plaintiff yelled and cursed at them and occasionally hit them. Mary's older son, John, testified that Plaintiff would hit him across the face with an open palm and continued to do so until Plaintiff got a reaction out of him. When Mary tried to intervene as Plaintiff engaged in this behavior with her sons,

---

[2] The only issue on appeal arises from the trial court's order granting JNOV in favor of Plaintiff on Defendant's abuse of process claim. Therefore, we do not address the evidence presented at trial regarding Plaintiff's alienation of affections claim except to the extent necessary to address the issue presented on appeal.

Plaintiff redirected the abuse toward Mary. At trial, Plaintiff denied the abuse of Mary and her children.

Mary met Defendant in May 2013, and they remained in contact through text messages and telephone conversations. The last incident of Plaintiff's abuse of Mary occurred in November 2013, after Plaintiff accused Mary of having an affair with Defendant. On 10 November 2013, Plaintiff arrived home drunk and told Mary's sons that they had a new father, Defendant, and they needed to leave. Plaintiff made threatening remarks to Mary, stating he would "cut her [vagina] out so that no one else could have her." Mary's younger son, Max, called the police and Mary and her sons stayed in a hotel that night. On 13 November 2013, after Mary and her sons returned home, Plaintiff yelled at John and made several degrading comments to him. Max again called the police. Later that day, Mary obtained a domestic violence protection order against Plaintiff, and he was required to leave the marital home. During Plaintiff's testimony, he denied what occurred on 10 and 13 November 2013.

Thereafter, Plaintiff and Mary communicated through attorneys about their separation and tried to settle their dispute about their Premarital Agreement. Mary ultimately moved to Florida in June 2014 and got engaged to Defendant in 2017.

Plaintiff refiled his complaint[3] on 14 September 2017 and Defendant's attorney informed Plaintiff's attorney that he would accept service on behalf of Defendant. But

---

[3] As noted above, Plaintiff had filed the first complaint against Defendant alleging alienation of affections in November 2015 and voluntarily dismissed that action on 15 September 2016.

Plaintiff did not attempt to have Defendant's attorney accept service. Instead, on 28 October 2017, Plaintiff arrived at Defendant's home purportedly to locate Defendant for service. That day, Defendant and John were upstairs watching a football game when they heard "screaming noises" coming from Mary. John immediately ran downstairs, with Defendant following behind, though he struggled to keep up due to the condition of his health. When John entered the garage, he saw Plaintiff yelling at Mary and "backing her up against the wall." Upon noticing John, Plaintiff turned to him and stated "[y]ou think you're big now. I'm going to hire someone to f*** your mom in the a**." Once Defendant made it downstairs, he saw Plaintiff "stumbling around drunk." Defendant told Plaintiff he needed to leave. In response, Plaintiff walked up to Defendant, spat on him, and left the home. They called the police, and Defendant was arrested and convicted in connection with the altercation.

According to Plaintiff's testimony, Defendant's attorney indicated that he would not accept service on behalf of Defendant, so Plaintiff hired a private investigator in Florida to serve him. The private investigator attempted to serve Defendant at his home three times before the date of the altercation. Following the unsuccessful attempts, Plaintiff drove to Defendant's home in Florida with a passenger in his vehicle. The passenger took photographs of Defendant's home and the vehicles parked in the driveway. Plaintiff then sent the photographs to the private investigator, along with a text message stating "[f]ound [Defendant] at home. See photos. Black Tahoe is his." Plaintiff testified that he never exited his vehicle,

did not observe anyone at the home, and left immediately after the photographs were taken.

Two days after the altercation, Mary filed a petition for a domestic violence protection order against Plaintiff in a court in Florida. The court held a hearing and heard testimony from Plaintiff, the passenger in Plaintiff's vehicle, Mary, and John. The court granted the petition and found: "there was absolutely no reason for [Plaintiff] to be over at [Defendant]'s residence;" "[Plaintiff] has a recent history of harassment towards [Mary];" and "[Plaintiff's] actions are of a larger scheme of harassment of [Mary] and her family."

Defendant was eventually served with the summons and complaint on 1 November 2017 while he was attending one of John's football games. The trial began on 14 August 2023. Following the evidence, Plaintiff moved for a directed verdict on Defendant's abuse of process claim. The trial court denied Plaintiff's motion. On 24 August 2023, the jury found Defendant not liable for alienation of affections and found Plaintiff liable for abuse of process. The jury awarded Defendant $932,042.00 in compensatory damages and $606,502.31 in punitive damages.

On 25 September 2023, Plaintiff filed a motion for JNOV, or alternatively, a new trial. The trial court held a hearing on Plaintiff's motion on 9 November 2023. By written order entered 30 November 2023, the trial court granted Plaintiff's motion. The trial court found "Defendant failed to introduce competent evidence to support both requisite elements for the counterclaim of abuse of process" and that "no

reasonable jury could have reached a verdict in favor of Defendant." Thus, the trial court ordered that the judgment entered based on the jury verdict should be amended to reflect that Plaintiff is not liable to Defendant for either abuse of process or punitive damages. On 14 December 2023, Defendant appealed from the trial court's order granting Plaintiff's motion for JNOV and "any amendments to the Judgment directed by the Order."

## II. Analysis

Defendant argues the trial court erred by granting Plaintiff's motion for JNOV. He argues there was substantial evidence presented to support his abuse of process claim and the trial court erred by setting aside the jury verdict and award of punitive damages.

A motion for JNOV is made under Rule 50 of the North Carolina Rules of Civil Procedure. N.C. Gen. Stat. § 1A-1, Rule 50 (2023). The motion "is essentially a renewal of an earlier motion for directed verdict." *Jones v. Corn*, 293 N.C. App. 596, 602, 902 S.E.2d 17, 23 (2024) (citation omitted); *see Martin v. Pope*, 257 N.C. App. 641, 644, 811 S.E.2d 191, 194 (2018) ("[A] directed verdict motion is an 'absolute prerequisite' to a JNOV motion." (citation omitted)). Accordingly, when the trial court denies a party's motion for directed verdict, that party "may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict[.]" N.C. Gen. Stat. § 1A-1, Rule 50.

Both a motion for a directed verdict and a motion for JNOV challenge the

sufficiency of the evidence. A motion for a directed verdict addresses whether there is sufficient evidence to submit the case to the jury, while a JNOV "provides the trial court with an opportunity to reconsider the question of the sufficiency of the evidence after the jury has returned a verdict." *Primerica Life Ins. Co. v. James Massengill & Sons Const. Co.*, 211 N.C. App. 252, 256-57, 712 S.E.2d 670, 675 (2011) (citation omitted). Stated differently, "[t]he purpose of a motion for JNOV is to test the sufficiency of the evidence on which the jury relied and to enter a judgment contrary to the jury's verdict if, as a matter of law, the evidence presented does not support that verdict." *Vanguard Pai Lung, LLC v. Moody*, ___ N.C. ___, ___, 912 S.E.2d 788, 791 (2025) (citation omitted).

When contemplating a motion for JNOV, "the trial court must view the evidence in the light most favorable to the nonmovant, resolving all conflicts in his favor and giving him the benefit of every inference that could reasonably be drawn from the evidence in his favor." *Hummer v. Pulley, Watson, King & Lischer, P.A.*, 157 N.C. App. 60, 65, 577 S.E.2d 918, 923 (2003) (citation omitted). This motion should not be granted "where there is more than a scintilla of evidence to support each element of a plaintiff's case." *Id.*; *see Morris v. Scenera Rsch., LLC,* 368 N.C. 857, 861, 788 S.E.2d 154, 158 (2016) (defining scintilla as "very slight evidence" (citations omitted)). "The nonmovant meets this low bar by demonstrating that the evidence would permit the jury to resolve the evidentiary conflicts in its favor based on more than raw 'suspicion, conjecture, guess, surmise, or speculation.'" *Moody,* ___ N.C. at

___, 912 S.E.2d at 792 (citation omitted).

Our Supreme Court has cautioned the trial court when considering a motion for JNOV, establishing that such a motion should be "cautiously and sparingly granted." *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 369, 329 S.E.2d 333, 338 (1985) (citation omitted). When a JNOV is granted, the trial court is, in effect, "deciding that the question has become one exclusively of law and that the jury has no function to serve." *Primerica Life Ins. Co.*, 211 N.C. App. at 257, 712 S.E.2d at 675 (citation omitted). In other words, it enables the trial court to "usurp the jury's role." *Corn*, 293 N.C. App. at 602, 902 S.E.2d at 23 (citation omitted). Consequently, "[t]he legal standard applied to a JNOV motion is quite demanding." *Moody*, ___ N.C. at ___, 912 S.E.2d at 791.

On appeal, "questions concerning the sufficiency of the evidence to withstand a Rule 50 motion for directed verdict or judgment notwithstanding the verdict present an issue of law[.]" *Jones v. Durham Anesthesia Assocs., P.A.*, 185 N.C. App. 504, 508, 648 S.E.2d 531, 535 (2007) (citation omitted). Therefore, this Court's review of a trial court's ruling on a motion for JNOV is *de novo*. *See Keith v. Health-Pro Home Care Servs., Inc.*, 381 N.C. 442, 455, 873 S.E.2d 567, 577 (2022). Under a *de novo* review, "we consider the matter anew and freely substitute our judgment for that of the trial court[.]" *Hodgson Const., Inc. v. Howard*, 187 N.C. App. 408, 412, 654 S.E.2d 7, 11 (2007) (citation, quotation marks, and ellipses omitted).

Here, the trial court granted Plaintiff's motion for JNOV on Defendant's abuse

of process claim. Abuse of process is "the misuse of legal process for an ulterior purpose. It consists in the malicious misuse or misapplication of that process *after issuance* to accomplish some purpose not warranted or commanded by the writ." *Chidnese v. Chidnese*, 210 N.C. App. 299, 310, 708 S.E.2d 725, 734 (2011) (emphasis in original) (citation omitted). Two elements must be established to prove abuse of process: "(1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceeding." *Beroth Oil Co. v. Whiteheart*, 173 N.C. App. 89, 99-100, 618 S.E.2d 739, 747 (2005) (citation omitted). Moreover, "the mere filing of a civil action with an ulterior motive is not sufficient to sustain a claim for abuse of process. . . . [A] plaintiff must allege the misuse of process after an action between the parties has already commenced." *Chidnese*, 210 N.C. App. at 312, 708 S.E.2d at 735.

The first element, "ulterior purpose," is met "when the plaintiff alleges that the prior action was initiated by [the] defendant or used by him to achieve a collateral purpose not within the normal scope of the process used." *Fox v. City of Greensboro*, 279 N.C. App. 301, 327, 866 S.E.2d 270, 291 (2021) (citation omitted). Likewise, "[o]ne who uses legal process . . . for the purpose of oppression or annoyance is liable in damages in a common law action for abuse of process." *Melton v. Rickman,* 225 N.C. 700, 703, 36 S.E.2d 276, 278 (1945). The second element, the "act" requirement, "is satisfied when the plaintiff alleges that once the prior proceeding was initiated, the defendant committed some willful act whereby he sought to use the existence of

the proceeding to gain advantage of the plaintiff in respect to some collateral matter." *Fox*, 279 N.C. App. at 327, 866 S.E.2d at 291 (citation and emphasis omitted). Stated another way, an "improper act or perversion taking place after the filing of the complaint that is wholly inconsistent with and collateral to the action instituted." *Fox v. Barrett*, 90 N.C. App. 135, 138, 367 S.E.2d 412, 414 (1988); *see Hewes v. Wolfe*, 74 N.C. App. 610, 614, 330 S.E.2d 16, 19 (1985) (noting that use of the legal proceeding "as a vehicle" to "achieve a purpose for which [the cause of action] was never intended" fulfills the "act" requirement).

We now must examine the evidence presented at trial to determine whether there is more than a "scintilla of evidence" to support each element of Defendant's abuse of process claim. *Hummer*, 157 N.C. App. at 65, 577 S.E.2d at 923. When assessing the evidence, we view all the evidence in the light most favorable to Defendant, considering any evidence which supports Defendant's claim as being true. *Bryant*, 313 N.C. at 369, 329 S.E.2d at 337-38; *see also Corn*, 293 N.C. App. at 607, 902 S.E.2d at 26 ("[W]e must give [the nonmovant] the benefit of every reasonable inference that may legitimately be drawn from the evidence[.]" (citations and quotation marks omitted)).

As to the first element, ulterior motive, Plaintiff's brief essentially concedes that the evidence, taken in the light most favorable to Defendant, would support a finding that Plaintiff had an ulterior purpose. Defendant presented evidence that Plaintiff initiated this action to harass, inconvenience, and embarrass Mary and

Defendant. Because we have omitted many facts presented in this trial based on the jury's ruling against Plaintiff on his claim for alienation of affections and the limited issue on appeal, we will simply note that even Plaintiff's summary of the circumstances leading up to his complaint illustrates the level of animosity he had against both Defendant and Mary:

> From [Plaintiff]'s vantage point, [Mary] had cheated on him, falsely accused him of domestic violence, taken his house away from him for one year, stolen his furniture, and started a new life with her now husband (and her then boyfriend). It was for that reason that his lawyer demanded that [Mary] honor the Premarital Agreement and give him back his home, settle and give him his life back or else he would do what it would take legally to do so.

> In this litigation, [Plaintiff] contended that [Defendant] alienated the affections of [Mary] which actions caused (in part if not in whole) the demise of the marriage and what [Plaintiff] contended were the baseless domestic violence proceedings (although he acknowledges that Judge Strickland did not believe his innocence in the original 50B filings and ruled against him).

As to the first element of ulterior motive, there is more than a scintilla of evidence that Plaintiff instituted this action against Defendant to continue his abuse of Mary.

Plaintiff's argument that the trial court did not err by granting the motion for JNOV focuses mainly on the second element, "an act in the use of the process not proper in the regular prosecution of the proceeding." *Beroth Oil Co.*, 173 N.C. App. at 99-100, 618 S.E.2d at 747 (citation omitted). Plaintiff argues that even if Plaintiff's filing of the lawsuit and the issuance of the summons "was undertaken maliciously,"

this is not sufficient to uphold the verdict for abuse of process because the "process was limited to the regular and legitimate function in relation to the cause of action stated in the complaint that initiated the process." Plaintiff's argument then focuses entirely on his version of the facts surrounding the attempted service of process at Defendant's home: that he "drove by [Defendant's] condo in an attempt to help his private investigator locate [Defendant] so he could serve him with process;" he "had a friend take photographs of [Defendant's] driveway and cars parked in it using [Plaintiff's] phone;" and Plaintiff's "process server ultimately served [Defendant] in public while attending [Mary's] son's football game." Plaintiff argues that he "had every right" to drive by Defendant's home on a public street and to allow someone in his car to take photographs of the "driveway or the cars in it" and he himself did not "actually [try] to serve that process." If these were the facts upon which we review the order granting JNOV, Plaintiff would be correct. Even if he had "evil purpose" in bringing the lawsuit against Defendant, "regular and legitimate use of process" in attempting to serve Defendant with the complaint would not be an abuse of process. As noted by our Supreme Court in *Melton v. Rickman*: "Evil purpose alone is not sufficient. The bad intent must finally culminate in the abuse, for it is only the latter which is the gist of the action. . . . Regular and legitimate use of process, though with a bad intention, is not a malicious abuse of process." 225 N.C. 700, 704, 36 S.E.2d 276, 278 (1945) (citations and quotation marks omitted).

But for purposes of review of the trial court's order granting JNOV, we must

view the evidence in the light most favorable to Defendant, and those facts differ greatly from those posited in Plaintiff's brief. Defendant's evidence shows that Plaintiff's "bad intent" did "finally culminate in the abuse." *Id.* The "abuse" was Plaintiff's trespass on Defendant's property and spitting on Defendant while he was at Defendant's home on the pretext of assisting the process server in serving the complaint. Had Plaintiff merely driven by Defendant's home, taken photographs of a car, and later had Defendant served in a public place, this would be a very different case.

Defendant presented evidence that, after Plaintiff's complaint was filed on 14 September 2017, Defendant's attorney offered to accept service on behalf of Defendant. Rather than letting Defendant's attorney accept service, Plaintiff used the need to serve Defendant as an excuse to drive to Defendant's home in Florida allegedly to locate him to assist the process server. But Plaintiff did not merely drive by; he trespassed on Defendant's property, went into the garage, and confronted Mary. John saw Plaintiff yelling at Mary and backing her against a wall. Plaintiff made verbal threats to John, stating he would hire someone to sexually assault Mary. Plaintiff spat on Defendant before leaving the home. Following this incident, a court in Florida granted Mary's petition for a domestic violence protection order against Plaintiff. The Florida court found that there was no reason for Plaintiff to be at Defendant's home and his actions were of a larger scheme of harassment toward Mary and her family. And although the findings of the Florida court are not determinative

for purposes of this action, they are part of the evidence presented to the jury and which we must consider in the light most favorable to Defendant for review of the order granting JNOV.

From this evidence, a jury could reasonably conclude that Plaintiff used the legal process for an ulterior purpose *and* committed acts to further that purpose which were not proper in the regular course of proceedings. He used the legal process—his claim he was helping the private process server to serve the summons and complaint on Defendant—as a pretext to trespass on Defendant's property, to confront Mary and John, and to assault Defendant by spitting on him. This evidence would allow the jury to conclude that Plaintiff brought this suit for an ulterior purpose and then committed an act to further his ulterior purpose in his visit to Defendant's home for the claimed purpose of serving the complaint. *See Corn*, 293 N.C. App. at 605, 902 S.E.2d at 25 (explaining that when reviewing the denial of a JNOV, "it was the jury's role to weigh the evidence–not ours").

Importantly, Plaintiff committed these acts *after* Defendant's attorney communicated that he would accept service on his behalf. Despite the attorney's offer to accept service for Defendant, Plaintiff did not even attempt to have Defendant's attorney accept service. Under Rule 4(a) of the North Carolina Rules of Civil Procedure, Plaintiff himself could not serve Defendant; this rule provides that "[o]utside this State, such proper person shall be anyone who is not a party and is not less than 21 years of age or anyone duly authorized to serve summons by the law of

the place where service is to be made." N.C. Gen. Stat. § 1A-1, Rule 4(a) (2023). Although Plaintiff himself could not serve Defendant, his actions were directed at "locating" Defendant for service. Plaintiff claimed there was a need for him to drive from his home in North Carolina to Defendant's home in Florida to assist the private process server by checking to see if Defendant was present at his home. But even if the process server needed help in locating Defendant, there would be no legitimate need for Plaintiff to get out of his car and trespass on Defendant's property, much less to confront and accost Defendant, Mary, and her son. Plaintiff could have simply advised the process server that Defendant was at home to allow the process server to serve the complaint. Based on this evidence, a jury could reasonably conclude that Plaintiff used the legal proceeding, specifically service of process, as a pretext to further abuse and harass Mary and Defendant.

We recognize that Plaintiff presented conflicting evidence, including his testimony that he was attempting to locate Defendant for service and that he merely drove by his home. However, we resolve all discrepancies in the evidence in Defendant's favor. *See Morris*, 368 N.C. at 862, 788 S.E.2d at 158 ("[I]n the context of a directed verdict and JNOV, the trial court must resolve [evidentiary] conflicts in [the nonmovant's] favor."). Thus, in the light most favorable to Defendant, there was "more than a scintilla of evidence" that Plaintiff used the process to accomplish an ulterior motive which was not within the normal scope of the process. *Hummer*, 157 N.C. App. at 65, 577 S.E.2d at 923. As Defendant presented sufficient evidence to

support his claim for abuse of process, the trial court erred by granting Plaintiff's motion for JNOV and setting aside the jury verdict. *See Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 720, 693 S.E.2d 640, 643 (2009) (noting that a JNOV is "not properly allowed unless it appears, as a matter of law, that a recovery cannot be had by the [nonmovant] *upon any view of the facts* which the evidence reasonably tends to establish" (emphasis added) (citations and quotation marks omitted)).

## III.    Conclusion

Defendant presented more than a scintilla of evidence supporting his abuse of process claim. Specifically, Defendant presented evidence that Plaintiff had an ulterior purpose and committed willful acts that were collateral to the action instituted. Thus, the trial court erroneously granted Plaintiff's motion for JNOV on Defendant's abuse of process claim. The trial court's order is reversed.

REVERSED.

Judges ARROWOOD and FREEMAN concur.